UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK . . . . x

|  |  |  |
|---|---|---|
| MICHAEL BARISONE | ) | |
| | ) | |
| | ) | |
| | ) | Case No. 1:25-cv-07458-ER |
| | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | AMENDED COMPLAINT |
| UNITED STATES | ) | |
| EQUESTRIAN FEDERATION | ) | |
| | ) | |
| | ) | |
| Defendant(s), | ) | |

Michael Barisone ("Barisone"), by his undersigned counsel, as and for his Complaint against the United States Equestrian Federation ("USEF") alleges as follows:

## PARTIES.

1.      Plaintiff Michael Barisone is a resident of the State of Florida with his principal place of residence located 3386 Grande Road, Loxahatchee, Florida 33470.

2.      Defendant United States Equestrian Federation (hereinafter "USEF") is a 501(c)(3) non-profit corporation organized and existing under the laws of the State of Kentucky with its principal place of business at 4001 Wing Commander Way, Lexington, Kentucky 40511.

3.      The USEF serves as the national governing body for equestrian sports in the United States.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over the claims in this action under 28 U.S.C. § 1332 which provides that this Court will have jurisdiction if the matter in controversy exceeds $75,000.00 and the dispute is between parties of different states.  In this matter diversity of citizenship exists as the Plaintiff is a citizen of the State of Florida and the Defendant is a citizen of the State of Kentucky and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.  This Court has personal jurisdiction over defendant USEF as the USEF has consistently transacted business in the State of New York since its inception in 2007.

5.     Venue is properly laid in this district pursuant to 28 U.S.C. § 1391 because as a stipulation of membership in the USEF, the membership application has a venue selection clause whereby a prospective member agrees that any court action must be brought either in the Southern District of New York or the Supreme Court for the State of New York, County of New York and as the Defendant is subject to personal jurisdiction in this district venue is proper in this district pursuant to 28 U.S.C.§ 139l(b)(3).

## APPLICABLE LAW

6.     The Ted Stevens Olympic and Amateur Sports Act, formerly known as the Amateur Sports Act 0f 1978, is codified primarily at 36 U.S.C.A. § 220501 et seq.  The USEF is the national governing body ("NGB") for equestrian sports in the United States by virtue of its certification under the authority of the Amateur Sports Act Of 1978.

7.     The Amateur Sports Act of 1978 outlines the responsibilities of NGBs, which includes compliance with policies and procedures related to athlete safety and provides

mechanisms for resolving disputes involving athletes, national governing bodies, and sports organizations.

8.      In 2017 Congress passed the <u>Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017</u> ("<u>Safe Sport Act</u>").

9.      Congress determined that an independent organization was critical to address athlete safety and abuse, and the Center for SafeSport was established in March 2017 to fulfill that need.

10.     Under the SafeSport Act, NGBs, such as the USEF are obligated to reported certain types of abusive conduct to the Center for SafeSport.

11.     If the complaint is of a sexual nature an NGB is obligated to refer the matter to the Center for SafeSport, and the Center for SafeSport must deal with the sexual complaint. However, if the complaint is not of a sexual nature, the jurisdiction of the Center for Safe Sport for non-sexual offenses is discretionary and the Center for Safe Sport may choose to accept jurisdiction for the offense or return the complaint to the NGB, who must deal with the offense in accordance with its governing documents.

12.     The By-laws, Rulebook and the Code of Conduct of the USEF (the "Governing Documents") are the governing documents of the USEF that mandate it to take certain actions if a member of the USEF initiates a complaint against another member of the USEF in which such member alleges that the member has violated the Governing Documents of the USEF and they have been the victim of bullying, harassment or other conduct prohibited by the Governing Documents of the USEF.

13.     Upon receipt of a complaint of a non-sexual nature by a member of the USEF against another member of the USEF, pursuant to USEF Bylaws Article 703.3 and Rulebook GR605, the

USEF is required to promptly investigate and, where warranted, take disciplinary action against members engaging in conduct detrimental to the integrity or welfare of the sport.

## MATERIAL PERSONS

14.    Hereinafter set forth is a description of the background of persons who are material to the facts set forth in this Complaint:

A.  Plaintiff Michael Barisone:

Equestrian Accomplishments:

Owner of Michael Barisone Dressage Stables, LLC, and Michael Barisone International LLC.

i.      Former Co-owner of 60 acres. Sweet Grass Farm, Long Valley, New Jersey
ii.     Sole owner of Barisone Dressage South, Loxahatchee, Florida
iii.    Olympian- 2008
iv.     Olympian long list – 2004
v.      Olympian alternate - 2000
vi.     Olympian alternate – 1996
vii.    Coach of Three Olympic medalists – 2012, 2016
viii.   Coach to dozens of top US and International Riders
ix.     Multi-time National Dressage Champion.
x.      Winner of more than 100 International CDI Grand Prix tournaments, including
xi.     World Dressage Masters and Nations Cup.
xii.    Former Member, USEF Board of Directors.
xiii.   Former Selection Committee Member.
xiv.    Former Member, Misc. USEF Committees.
xv.     Representative for Equestrian to United States Olympic Committee Athletes Advisory Committee.

Background of Michael Barisone Prior to Meeting Lauren Kanarek:

xvi.    Never had an addiction to alcohol.
xvii.   Never used illicit drugs of any kind.
xviii.  Never been to Court except for minor traffic infraction and divorce.
xix.    Never had driving license suspended or revoked.
xx.     Never questioned, arrested, or stopped for any reason by police.
xxi.    Never detained or charged with a crime.
xxii.   Never suffered from or been treated for any form of mental illness.
xxiii.  Never been sued or audited for taxes.

4

1.      Financial Status as of August 7, 2019, of Michael Barisone.

Assets:         $4.5 million Liabilities:        Less than $100,000.00

15.     Lauren Kanarek ("Kanarek")

    i.      Owned no property.
    ii.     Unemployed.
    iii.    No means of support.
    iv.     Entire adult life spent as heroin addict.
    v.      Chronic history of abuse of prescription medications, including Opiod pain killers, Suboxone, Clonoin, Klonoin, Ambien and Seroquel.
    vi.     Entire life diagnosis of Bi-PolarI disorder, and frequently untreated.
    vii.    History of multiple drug rehab/detox commitments.
    viii.   Worked as stripper and upon information sufficient to form a belief, worked as a prostitute.
    ix.     History of numerous arrests and criminal charges, including assault with a deadly weapon.
    xx.     History of domestic violence.
    xxi.    History of stalking, harassing, cyberstalking, bullying, threats of physical violence, criminal invasion of privacy, breaking and entering and other crimes and offenses.
    xxii.   At least three individuals have made complaints against Kanarek for stalking, threatening, infliction of emotional abuse, and harassing with the USEF.

16.     Kathryn "Kat" Parkinson.

Ms. Parkinson is an equestrian residing in North Carolina and a member of the USEF. She maintains a business providing services to competitors at USEF horse shows. She also provides services to horse show management providing night watch services for horses at USEF competitions.  Ms. Parkinson enjoys an excellent reputation with the USEf as evidenced by the fact that USEF sponsored horse shows have continuously utilized her services at numerous horse shows for many years.

17.     Robin Breuckmann.

Ms. Breuckmann is a well-known and highly respected Paralympian with the following accomplishments and a member of the USEF:

2010: U.S. Team member – Alltech World Equestrian Games, Lexington, Ky.

5

2008:  U.S. Paralympic Team member, Equestrian - Beijing, China 2007: NCDCTA Grand Prix Horse of the Year, Richmond

2007:  USEF National Horse of the Year Training Level, Radetzky 2005: Grand Champion Dressage horse for USEF

2004:  Alternate for U.S. Paralympic Team - Paralympic Games, Athens, Greece

2000:  Sixth place (Team) - Paralympic Games, Sydney, Australia

18.     Josephine "Joey" Stagaard:

Ms. Stagaard resides in New Jersey and is not involved in the equestrian world in any way.  The only connection she has with Kanarek is that Kanarek dated Ms. Stagaard's fiancé approximately 20 years ago.

## KANAREK'S ABUSE, HARASSMENT AND VIOLATIONS OF USEF BY-LAWS, RULEBOOK AND CODE OF CONDUCT

### Kathryn Parkinson

19.     For a period of time commencing in or around 2016 Ms. Parkinson worked as an assistant/groom for Kanarek.  After several months of employment, Ms. Parkinson chose to quit working for Kanarek as Kanarek was verbally abusive and regularly exhibited outbursts of violent rage towards Ms. Parkinson.  During the course of her employment by Kanarek, Ms. Parkinson learned numerous acts of disturbing conduct directed at other persons by Kanarek as well as other facts damaging to Kanarek.  Subsequent to her employment by Kanarek, Kanarek waged a war of vengeful and merciless conduct towards Ms. Parkinson on public social media and in text messages.  Ms Kanarek never gave Ms. Parkinson an explanation for the threatening and at times terrifying conduct directed at her by Kanarek.  However, Ms. Parkinson concluded that Kanarek suffered from a sociopath condition and Ms. Parkinson decided that the only explanation for Kanarek's conduct was the fact that Ms. Parkinson knew a great deal about her disturbing personal life as well as her abusive conduct towards others.  Ms.

6

Parkinson believed that the behavior towards her was undertaken in an effort to "shut her up" about Kanarek's history and her abusive and unacceptable conduct towards others.

20.    Overwhelmed and in fear for her safety, knowing Kanarek was a member of the USEF, Ms. Parkinson in an effort to save her reputation, business and well-being, turned to the USEF with the hope that when told of the abusive and threatening conduct which Kanarek directed at her, the USEF would intervene and take action to stop the threatening, harassing, and abusive behavior directed at Ms. Parkinson by Kanarek.   On March 30, 2018, Ms. Parkinson contacted the USEF by sending an email to the USEF's Customer Care portal and asked if the USEF had any rules/regulations against members bullying, harassing and cyber stalking other people in the equine industry.  A copy of the email from Ms. Parkinson to USEF Customer Care dated March 30. 2018 is attached as Exhibit "A."

22.    Rather than receiving a response from a person, a short time after sending her email, Ms. Parkinson received an automatically generated email response from USEF stating that no one was in the office, but the USEF would respond as soon as possible during normal business hours.  A copy of the email response to Ms. Parkinson dated March 30, 2018, is attached as Exhibit "B."

23.    On April 2, 2018, USEF Customer Care forwarded Ms. Parkinson's email to the USEF Regulation Department Director Emily Pratt.  A copy of the email from the USEF Customer Care to Emily Pratt is attached hereto as Exhibit "C."

24.    On April 2, 2018  rather than initiating an investigation on its own which it was obligated to do pursuant to its Governing Documents, or referring the matter to the Center for Safe Sport which possesses discretionary jurisdiction for complaints against members of NGB's for non-sexual prohibited conduced such as bullying and harassment, Ms. Pratt responded to Ms. Parkinson by advising her

7

that the USEF has a Safe Sport policy and advised Ms. Parkinson to complete a "Safe Sport Incident Report Form."   A copy of the April 2, 2018, email from Emily Pratt to Kathryn Parkinson is attached as Exhibit "D."

25.     Later that same day after receiving Ms. Pratt's email Ms. Parkinson contacted Ms. Pratt and provided her with the details of Kanarek's abusive and threatening behavior towards her as requested by the Safe Sport Incident Report Form . A copy of Ms. Parkinson's second email to Emily Pratt on April 2, 2018, is attached as Exhibit "E."

26.     In her email of April 2, 2018, Ms. Parkinson provided Ms. Pratt with the details of Ms. Kanarek's abusive conduct as requested by the "Safe Sport Incident Report Form" and by Ms. Pratt.  Ms. Parkinson wrote that Kanarek had engaged in the following conduct towards her:

        i.      She accused Ms. Parkinson of animal abuse.
        ii.     She accused Ms. Parkinson of insurance fraud.
        iii.    She accused Ms. Parkinson of being a drug addict.
        iv.     She accused Ms. Parkinson of sexual exploitation of her own children.
        v.      She stalked Ms. Parkinson.
        vi.     She accused Ms. Parkinson of theft, labeling her a "grifter."
        vii.    She attempted to destroy Ms. Parkinson's business.

Copies of the exchange of text messages between Ms. Parkinson and Kanarek which were sent to Pratt are attached hereto as Exhibit "E-1."

27.     More than a week later on April 10, 2018, Ms. Pratt sent Ms. Parkinson an email advising her that the information she provided had been forwarded to the USEF legal department.  A copy of Ms. Pratt's email of April 10, 2018, is attached as Exhibit "F."

28.     Notwithstanding the complaints regarding Kanarek that Ms. Parkinson had provided to Ms. Pratt, Ms. Parkinson heard nothing from the USEF for several months and the USEF took no action to protect from Kanarek's abusive conduct, nor did it initiate an investigation into Ms. Parkinson's complaints against Kanarek.

29.     On October 26, 2018, Ms. Parkinson wrote to Ms. Pratt advising her that she had heard nothing from the USEF and that it was clear to her that the USEF had done nothing in response to her complaints since Kanarek was still competing.  More importantly, in her email to Ms. Pratt, Ms. Parkinson advised Ms. Pratt that Kanarek's conduct towards her had not changed and she was still harassing and threatening her in same manner as she had complained six months earlier in April.  Attached to the email to Ms. Pratt were copies of the harassing and threatening statements of Kanarek which appeared on her Instagram account.  A copy of Ms. Parkinson's October 26, 2018, email to Ms. Pratt is attached as Exhibit "G."

30.     Once again, Ms. Parkinson received no reply from Ms. Pratt or from anyone at the USEF.

31.     On November 7, 2018, Ms. Parkinson wrote to Ms. Pratt and pointedly asked her if the USEF was going to do anything to stop the harassing and threatening conduct of Kanarek.  A copy of Ms. Parkinson's November 7, 2018, email is attached as Exhibit "H."

32.     Ms. Parkinson received no reply from Ms. Pratt and to this date Ms. Parkinson has not heard anything from the USEF and more importantly, to this date the USEF has not initiated an investigation into Kanarek's conduct, and though the health, welfare and safety of a member of a member of the USEF was at risk, the USEF did not impose a Temporary Suspension  on Kanarek, which it was empowered to do by virtue of its  Governing Documents,    and Kanarek's abusive conduct towards Ms. Parkinson continued for months after Ms. Parkinson's November 7, 2018 communication with the USEF.  Based upon information sufficient to form a belief, Kanarek's abusive conduct towards Ms. Parkinson is still ongoing.  Given the nature of the information Ms. Parkinson provided to the USEF it should have been foreseeable by the USEF that Kanarek's conduct would continue, and she would abuse and torment other members of the USEF.  As evidenced by facts presented herein

with respect to Ms. Parkinson, Ms. Brueckmann, Ms. Stagaard (collectively the "Claimants") and the Plaintiff, Kanarek did continue her foreseeable abusive, stalking, harassing and terrorist conduct and notwithstanding the fact that it was foreseeable by the USEF that Kanarek would continue this behavior, the USEF did nothing.

**Robin Breuckmann**

33.     Robin Breuckmann is a member of the USEF and a well-known and highly regarded Paralympian, as well as a licensed USEF official.

34.     In and around 2016 Ms. Breuckmann gave Kanarek riding lessons.

35.     At some point Kanarek became displeased with the lessons she was receiving and rather than simply terminating her lessons with Ms. Breuckmann, Kanarek attacked Ms. Breuckmann and made very abusive, threatening, and vulgar statements to Ms. Breuckmann and posted threatening comments about Ms. Breuckmann on her social media accounts.

36.     In her position as a well-known and highly regarded trainer, Ms. Breuckmann became aware of threatening and harassing statements Kanarek had made about other persons in the equestrian community.

37.     Ms. Breuckmann was so concerned and fearful of Kanarek's conduct that sometime during 2017 or 2018 she contacted the USEF and was advised to forward to Ms. Pratt copies of all the threatening, dangerous and abusive texts Kanarek had directly sent to Ms. Breuckmann. She complied with this request and forwarded copies of the statement to the USEF.

38.     To this date, Ms. Breuckmann has received no response from Ms. Pratt or anyone else at the USEF to the abusive, dangerous, and threatening posted statements directed at Ms. Breuckmann and others made by Kanarek.  To this date the USEF has not initiated an investigation into Kanarek's conduct, and though the health, welfare and safety of a member

of a member of the USEF was at risk, the USEF did not impose a Temporary Suspension on Kanarek and Kanarek's abusive conduct towards Ms. Brueckmann continued for months after Ms. Breuckmann's November 7, 2018 communication with the USEF. Based upon information sufficient to form a belief, Kanarek's abusive conduct towards Ms. Parkinson may still be ongoing. Based upon the information Ms. Brueckmann provided to the USEF it should have been foreseeable by the USEF that Kanarek's conduct would continue, and she would abuse and torment other members of the USEF. As evidenced by the facts presented herein with respect to the "Claimants" and the Plaintiff, Kanarek did continue her foreseeably abusive, stalking, harassing and terrorist conduct and notwithstanding the fact that it was foreseeable by the USEF that Kanarek would continue this behavior, the USEF did nothing. By virtue of its failure to take any action against Kanarerk, the USEF breached its obligations to Ms. Breuckmann under the Governing Documents, and the breach of its obligations has been ongoing to the present date.

**Joey Ann Stagaard**

39.     Ms. Stagaard is not a horse person and has nothing to do with anything equestrian.

40.     Ms. Stagaard has never met or spoken to Kanarek.

41.     Despite the fact that there has been no history or interaction of any kind between Ms. Stagaard and Kanarek, that did not stop Kanarek from attacking Ms. Stagaard and engaging in a reign of terror upon her.

42.     On April 3, 2018, Ms. Stagaard called the USEF and spoke with Sarah Gilbert, who is the current USEF Safe Sport Senior Program Manager, and at the time of the phone call was a Legal Assistant. Ms. Stagaard provided Ms. Gilbert with the details of the harassing, threatening and abusive conduct Kanarek had directed against Ms. Stagaard.

43.    Ms. Stagaard followed up her telephone conversation with Ms. Gilbert with an email to her in which she advised Ms. Gilbert that Kanarek had been harassing, cyber bulling and threatening her since 2015.  In her email to Ms. Gilbert Ms, Stagaard reported that she had learned that the kind of harassing and threatening conduct Kanarek was directing at her, was common for Kanarek and she had been engaging in this kind of conduct with numerous other women.

44.    Ms. Stagaard advised Ms. Gilbert that she had never met or spoken with Kanarek, and Ms. Stagaard speculated that the only reason for the reign of abusive being inflicted upon her was the fact that 20 years earlier Kanarek had dated her then current fiancée and Kanarek was jealous of that relationship.

45.    In her email to Ms. Gilbert, Ms. Stagaard related the tragic story that 20 years earlier she lost her very young son in a drowning accident at her family pool and that Kanarek was aware of her son's death by drowning.

46.    Rather than an expression of sympathy, Ms. Stagaard advised Ms. Gilbert that Kanarek was posting on Facebook social media that Ms. Stagaard was a murderer, baby killer, and that at the time her son had died Ms. Stargaard was engaged in a deviant sexual act.

47.    Ms. Stagaard expressed her opinion to Ms. Gilbert that Kanarek might have some form of mental illness as well as a serious illicit drug habit since her hateful and disgusting comments made absolutely no sense to Ms. Stagaard.

48.    On April 3, 2018, Ms. Stagaard forwarded to Ms. Pratt copies of some of the hundreds of messages Kanarek had posted about Ms. Stagaard to Ms. Gilbert.  Copies of a fraction of the deviant and very disturbing social media posts of Kanarek are collectively attached as Exhibit "I."

49.    In her email to Ms. Pratt, Ms. Gilbert commented "Here are some of the hundreds of

Facebook msgs she sent."

50.    On April 16, 20218 Ms. Pratt responded to the email and telephone call by Ms. Stagaard and the only issue she discussed is the fact that the USEF had difficulty getting all the attachments Ms. Stagaard sent.  The comment by Ms. Pratt is curious since we have the email from Ms. Gilbert to Ms. Pratt sending her the attachments she received from Ms. Stagaard. There is no mention of the complaint against Kanarek in her email to Ms. Stagaard or any mention that the USEF would begin an investigation into the complaints as was required of it.

51.    On April 22, 2018, Ms. Stagaard responds to Ms. Pratt by sending her all the attachments a second time.

52.    In addition to sending all the attachments a second time, Ms. Stagaard sent the following email to Ms. Pratt:

> "Emily,
>
> Enclosed are some of the letters Lauren sent to me. 3 years ago, I started dating my now fiancé, Carmen.  Apparently, Lauren dated Camien 24 years ago when in high school.   She started leaving nasty remarks on our photos and videos via Facebook.  I found out from the people she went to high school with that she does this to every girl who ever dated any of her ex's. Apparently, Lauren and her boyfriend are addicted to heroin and now take methadone for it.   I don't know if it is when she is high that she goes on attack.  I contacted her local police department and advised them next time she sends me anything I am filing a restraining order against her.  I lost a child in 1999, and Lauren sends me comments advising me I-am a murder that I murdered my son. My son drowned witnessed by many and I am sickened by this girls nature who seems to get away w/ her sick actions.
>
> Any questions or comments you can contact me at 609-384-2611 I do not check my email much.
>
> Joey Ann Stagaard"

53.    After providing all the information discussed above, Ms. Stagaard never received any communication from Ms. Pratt or any one at the USEF, and more importantly, to this date

the USEF has not imposed a Temporary Suspension, nor has it initiated an investigation into Ms. Stagaard's complaint and has taken no action to protect Ms. Stagaard from the very dangerous conduct of Kanarek towards Ms. Stagaard. Nor did Ms. Pratt refer Ms. Stagaard's complaints to the Center for Safe Sport, which could have exercised its discretionary jurisdiction with respect to Ms. Stagaard's complaints. Based upon the information Ms. Stagaard provided to the USEF it should have been foreseeable by the USEF that Kanarek's conduct would continue, and she would abuse and torment other members of the USEF. As evidenced by facts presented herein with respect to the Claimants and the Plaintiff, Kanarek did continue her foreseeably abusive, stalking, harassing and terrorist conduct and notwithstanding the fact that it was foreseeable by the USEF that Kanarek would continue this behavior, the USEF did nothing. Notwithstanding the fact that Ms. Stagaard was not a member of the USEF under the SafeSport Act, the USEF had an obligation to refer the matter to the Center for SafeSport, and it did not make the mandated referral.

54.    In addition to the complaints made by the Complainants in 2018, had the USEF met its obligation under its Governing Documents and initiated an investigation, based upon statement made by Ms. Parkinson to the Plaintiff, upon information sufficient to form a belief it is probable that at least 15 other members of the USEF would have been identified as victims of Kanarek.

55.    Ms. Parkinson has advised the Plaintiff that she is aware of the identity of at least eight (8) other women residing in Kanarek's former home state of North Carolina who Kanarek has victimized in a similar manner as she has persecuted the Claimants.

56.    Kanarek has been engaged in decade long attack on innocent woman and had the USEF complied with its obligations under the SafeSport Act or its own Governing Documents, in

light of the imminent harm that Kanarek's conduct represented, the USEF could have summarily imposed a Temporary Suspension upon Kanarek, which it is able to do under its Rulebook. Further, a review of her social media postings would have revealed not less than fifteen (15) additional woman who had been or were currently under attack by Kanarek.

57.    The inescapable fact is that had the USEF met its legal obligation under the Safe Sport Act and/or its Governing Documents, the only reasonable conclusion one could reach is that Kanarek's Temporary Suspension would have summarily been imposed upon her by the USEF and an investigation would have commenced leading to the wealth of irrefutable evidence of her habitual violation of the SafeSport Code of Conduct and the Governing Documents of the USEF which, without a doubt, would have led to a more permanent sanction or lifetime ban imposed upon her in 2018, or at the latest, early 2019. Such sanctions would have become public knowledge and would have prohibited, under the SafeSport Code, other USEF members, and professionals, including the Plaintiff, from engaging in any professional equestrian activities with Kanarek, including her training.

58.    Had a Temporary Suspension, or a lifetime ban been imposed upon Kanarek in 2018 or 2019, the Plaintiff would have been obligated to terminate his relationship with Kanarek, and she would have been required to leave his farm. As a result, the August 7, 2019, incident would never have occurred.

59.    What follows is the tragic story of the Plaintiff's interaction with Kanarek, a story that ends with an innocent man's life destroyed and the loss of his freedom for 5 years.

60.    In and around August 2017 the Plaintiff was approached at a clinic he was conducting by a trainer who asked if she could come to Florida for the month of March 2018 and train with the Plaintiff. The trainer also asked if it were possible if one of her clients, who was an

amateur rider, could likewise train with the Plaintiff for that month.

61.     The Plaintiff agreed that the trainer as well as her client could train with him in Florida for the month of March 2018 and the trainer was told to have her client reach out to the Plaintiff so he could explain the cost of training with him and he could explain his training program and the rules of his training program to the trainer's client.

62.     The amateur rider who was asking to train with the Plaintiff in Florida was Kanarek.

63.     On or around January 1, 2018, the Plaintiff had a conversation with Kanarek in which he explained the rules of his training program and how his program works and what the cost would be for training in Florida for the month of March 2018.  Kanarek advised the Plaintiff that his terms were acceptable and that she would like to bring two horses to train with him and the Plaintiff agreed to allow her to bring two horses to his Florida program.

64.     On or around March 1, 2018, Kanarek arrived at the Plaintiff's Florida training facility with one of her horses and the other horse arrived shortly thereafter.

65.     When the Plaintiff first spoke with Kanarek in January, she represented herself as a skilled rider who wanted to train and compete at the upper levels of Dressage.

66.     Shortly after she arrived, she rode for the Plaintiff to demonstrate her skill, and it was manifestly clear to the Plaintiff that Kanarek had misrepresented her ability as a rider and that Kanarek was a low-level rider with very limited ability.  In light of her lack of skill the Plaintiff decided that it would be more appropriate for Kanarek to train with the Plaintiff's assistant, Justin Hardin ("Hardin") who was a highly regarded trainer and talented rider.

67.     Kanarek was advised that she would be training with Hardin, and she did not object.

68.     In the first few days of her presence at the Plaintiff's Florida facility Kanarek exhibited

frequent outbursts of temper and arguments with her boyfriend, Rob Goodwin ("Goodwin").

69.     In mid-March Kanarek approached the Plaintiff to tell him that she enjoyed training with Hardin and after the winter show season ended in Florida, she would like to continue training at his training facility in Long Valley, New Jersey.

70.     The Plaintiff accepted Kanarek as a client at his New Jersey training facility, however, unbeknownst to the Plaintiff, Kanarek somehow became aware that the Plaintiff had an empty apartment at his Long, Valley, New Jersey training facility that was usually used by working students.  Kanarek asked if she and her boyfriend could temporarily reside in the apartment while she trained with the Plaintiff until she found living quarters.

71.     As the apartment was not being used, as an accommodation to Kanarek, the Plaintiff agreed to allow Kanarek and her boyfriend to occupy the apartment, however, the Plaintiff made it absolutely clear to Kanarek that this was a temporary situation and an act of generosity and no tenancy was being created as a consequence of this arrangement.  Accordingly, the Plaintiff told Kanarek that he could terminate the arrangement at any time, and she and her boyfriend would be required to vacate the premises immediately.  Kanarek stated that she understood the Plaintiff's terms and accepted them, whereupon Kanarek was permitted to move into the apartment.

72.     While still in Florida in April 2018 Kanarek became enamored with one of the Plaintiff's horses, "Jay-T" and asked  Hardin if she could be allowed to ride the horse.  As it was common to allow students to ride well trained horse so they could experience the ability and skill of an upper-level horse that was beyond their own ability, Hardin agreed that Kanarek could ride "Jay-T."

73.     Over the succeeding months Kanarek became more smitten with "Jay-T" and started

17

demanding that she be permitted to ride him. When demanding to ride "Jay-T" she would be very aggressive. Rather than risk a potentially of an unpleasant confrontation with Kanarek, Hardin continued to allow Kanarek to ride "Jay-T." As the Plaintiff was not training Kanarek he was unaware of the unreasonable demands that Kanarek was directing at Hardin.

74.    With no knowledge of or consent by the Plaintiff, on or about July 1, 2018, Kanarek announced that she would taking "Jay-T" to a horse show. She did not ask the Plaintiff or Hardin for permission to show "Jay-T."

75.    Upon learning that Kanarek intended to show "Jay-T" the Plaintiff approached Kanarek and told her that "Jay-T" was well beyond her ability and that she should not show him. Kanarek refused to accept the Plaintiff's opinion of her ability to ride "Jay-T," and she persisted in her demand that she show the horse. The Plaintiff gave in hoping that the very likely poor performance by Kanarek would teach her lesson and she would respect the Plaintiff's judgement about her abilities.

76..    K a n a r e k ' s  performance at the show was abysmal and Kanarek's reaction to her poor performance was to blame "Jay-T" and Hardin's poor training.

77.    "Jay-T" was a very talented and valuable horse and over the succeeding months the Plaintiff tried to recapture control of the horse and every time the Plaintiff tried to exert control over the horse, at Kanarek would have a fit and refuse to accept the Plaintiff's opinion that the horse was beyond her ability. At this time, the Plaintiff had not been exposed to Kanarek's psychotic threatening behavior and he regarded Kanarek as another very difficult client, and not that much different than other difficult clients he had over the many years he had been training riders and their horses. The Plaintiff had very little insight into the terror that was about to become very obvious.

78.     From the fall of 2018 through the summer of 2019 Kanarek's and Goodwin's behavior became more unstable, and by the early part of 2019 it was common for her to be cursing and screaming at Goodwin and other persons at the Plaintiff's facility.  Despite being told that the area of the barn where the horses were stabled were closed to clients after 8:00 pm, it was common for both Kanarek and Goodwin to ignore the Plaintiff's rules and go into the stabling areas where the Plaintiff's and other clients horses were stabled at all hours of the night By the first months of 2019 Plaintiff was becoming increasingly terrified of Kanarek and Goodwin, fearful of physical harm by Goodwin and he believed that Kanarek and Goodwin were deliberately ignoring his rules so as to cause the Plaintiff an emotional breakdown so much so that he genuinely believed that they would burn down his farm and do harm to the horses.

79.     Unfortunately, the tactics of Kanarek and Goodwin were working so much so that the Plaintiff lived in constant fear for, not only his own physical safety, but for the safety of his girlfriend and her children.  It would later be learned by the Plaintiff that Kanarek engaged in an online search to locate the Plaintiff's girlfriend's children at her ex-husband's home in North Carolina.  The Plaintiff review of Kanarek's and Goodwin's online search revealed that immediately after locating the children, Kanarek searched online for extremely devastating and potent forms of ammunition for the handgun the Plaintiff knew she possessed.

80.     Kanarek's obsession with "Jay-T' reached its zenith in December 2018. Notwithstanding the true value of "Jay-T" of not less than $80,000.00 by means of physical threats to the Plaintiff, threats to cause harm to the Plaintiff's farm, threats to the Plaintiff's horses and even threats of lawsuits, the Plaintiff was so terrified of Kanarek and Goodwin that he ultimately gave in and sold Kanarek "Jay-T" for the absurd price of $30,000.00.

81.     In January 2019, as he did every year, the Plaintiff relocated to his farm in Loxahatchee,

Florida so that he and his clients could participate in the winter equestrian events that take place in Wellington, Florida and Loxahatchee, Florida.

82.     In January 2019, while relocated to Florida, a pipe froze at the house in Long Valley, New Jersey that Kanarek and Goodwin had been occupying.

83.     The damage was significant, and the home became unhabitable so Kanarek was told she would have to find alternative housing.  She was so angry by this inconvenience that she screamed and cursed at the Plaintiff.  Notwithstanding the fact that it was determined by the home owner insurance carrier that the burst pipe was an accident, Kanarek threatened to report the Plaintiff for insurance fraud and that she would be reporting him to the New Jersey Department of Insurance.

84.     It should be understood that commencing in January 2019 and continuously thereafter the Plaintiff told Kanarek that she must remove her horses and vacate the apartment he gratuitously provided to her and leave his farm.  Kanarek's response was always the same. She would refuse to leave and in response to the Plaintiff's demand that she leaves she would threaten physical harm to him, his fiancée, his farm, and the horses as well as threaten lawsuits for a host of improbable and absurd reasons.

85.     Hindsight makes if clear that at this point the physical threats to his person and to his girlfriend and her children as well as threats to burn down his farm and harm his horses had broken the Plaintiff emotionally.  The Plaintiff was a shell of his former self.  The physical and emotional damage to the Plaintiff was obvious to friends, colleagues, and family.  It should also be understood that ultimately in an effort to have Kanarek and Goodwin removed from the property the Plaintiff repeatedly contacted the local police and told them that he and his fiancée were in fear for their lives, and gave examples of the frightening and menacing

conduct that was directed at him by Kanarek and Goodwin. Regrettably, the police never intervened. In each instance the police responded by telling the Plaintiff it was a civil matter, and they could not get involved.

86.    By mid-March 2019 Kanarek's behavior was disturbingly violent and irrational. An incident occurred at that time when Kanarek's mother came to the farm to watch her daughter ride. During her lesson Kanarek lost her temper and exploded, calling her mother an assortment of extremely vile and repulsive names. Kanarek's mother's response was to ask Kanarek if she was no longer taking her anti-psychotic medication. To which Kanarek responded "Of course not. It makes me fat." Needless to say, the Plaintiff had no idea that Kanarek was taking anti-psychotic medication, and had he known this in January 2018 he never would have accepted her as a student.

87.    In addition to violent and unpredictable outbursts, Kanarek started exhibiting paranoid symptoms saying that everyone was talking about her behind her back and saying untrue things about her.

88.    The terrifying state of affairs reached its peak in June 2019. Several students of the Plaintiff, including his girlfriend were scheduled to compete at a local show on the weekend of June 6, 2019. Kanarek was also scheduled to compete at the show with her two horses.

89.    Despite being repeatedly told the specific time that she must be at the showgrounds, on the first day of the show Kanarek arrived late and immediately started screaming at the Plaintiff that he must abandon his other students and help her get ready to compete. On the second day of the show Kanarek announced that she could not compete because Goodwin had disappeared. She said that he was undoubtedly on a drug binge, which she admitted was very common for him. Kanarek went on to say that it was Goodwin's practice to go to cheap motels

with prostitutes, drink, and smoke crack. From her demeanor, it was clear that this behavior was not unusual for Goodwin, and more disturbing than his behavior was the fact that Kanarek was not at all phased or surprised by any of this behavior by Goodwin. The Plaintiff concluded that Kanarek and Goodwin were illicit drug users and, more than ever, he knew he had to find some way to get them to leave his property. The Plaintiff continued to deteriorate and at this point he was unable to perform the necessary functions to care for his farm and horses. The Plaintiff became more and more reliant on Justin and barn help to perform the function he had previously routinely performed.

90.     At this time Kanarek began posting contemptible, disturbing, and threatening messages about the Plaintiff and his girlfriend on all forms of social media for the public to see. It was common for Kanarek to post pages of social media messages with veiled, but very obvious threats of physical harm to the Plaintiff and his girlfriend and even threatening to kill the Plaintiff. Kanarek posted messages stating that the Plaintiff was an adulterer, drug addict, pervert, cheat, horse abuser, and thief. All efforts on the part of the Plaintiff begging Kanarek to cease her contemptible behavior failed. Though the Plaintiff begged Kanarek to leave his farm since he was fearful of being in hers and Goodwin's presence, let alone train her, she adamantly refused to leave. Kanarek's refusal to leave a trainer who refuses to train her is clear evidence of her diabolical agenda since no rider stays at a training facility when they are told they will not be trained.

91.     The Plaintiff and his girlfriend occupied a separate apartment in the house that also had the apartment in which Kanarek and Goodwin resided. However, the Plaintiff and his girlfriend became so fearful of their safety that they chose to abandon their home and move into the lounge in the barn. Moreover, the Plaintiff became so fearful that Kanarek or Goodwin would do harm to his property and his and his clients' horses that the Plaintiff

abandoned regular sleep and believed it was necessary for him to patrol the property throughout the night.  Since Kanarek made it clear to him that she possessed firearms the Plaintiff found it necessary to patrol his 60-acre farm armed with a baseball bat.

92.     It became clear to the Plaintiff's girlfriend, to Hardin and to many of the Plaintiff's clients and business associates that Kanarek had broken the Plaintiff.  The Plaintiff could not sleep, neglected personal hygiene by not bathing, shaving, or even combing his hair. The Plaintiff's entire life was consumed by his fear of Kanarek and the harm she could do to him, the people he cared for and the home and horses he had worked tirelessly throughout his entire life to accumulate.

93.     In July 2019, the Plaintiff's girlfriend was accosted by Kanarek who screamed and yelled that she was "building a case against" the Plaintiff.  Kanarek screamed that she would destroy the Plaintiff and his girlfriend's lives and that the Plaintiff would be forced to give his farm to Kanarek.

94.     Terrified, frustrated, and overwhelmed, the Plaintiff turned to the USEF for help.   The Plaintiff believed that the USEF as the penultimate governing body for all equestrian activities in the United States, including its members, had the power to intervene and stop the reign of terror Kanarek was inflicting upon the Plaintiff, his girlfriend, his farm, and his horses.

95.     On August 1, 2019, the Plaintiff called Sonja Keating, ("Keating") Chief Operating Officer and General Counsel for the USEF.  The Plaintiff and Keating had known each other for many years as the Plaintiff had been a Director of the USEF and Keating, and the Plaintiff had served on several committees together.

96.     The Plaintiff told Keating that he was living in a life and death situation due to the malevolent and dangerously unpredictable conduct of Kanarek and Goodwin.  He told Keating that he was fearful that Kanarek will do physical harm to him and might even kill him

and his girlfriend. During his telephone conversation with Keating, the Plaintiff gave Keating numerous examples of the irrational and dangerous conduct of Kanarek and Goodwin and told her that he was forced to move out of his home for fear of what Kanarek might do to him and his girlfriend. During the conversation, the Plaintiff made every effort to communicate to Keating the terrifying situation in which he and his girlfriend found themselves.

97.    In response to all she heard Keating agreed that it was a terrifying situation but offered no assistance from the USEF. She inquired whether the Plaintiff had called the police, and the Plaintiff told her that the police refused to help. Notwithstanding the fact that under the Code of Conduct of the USEF Keating had the ability to take immediate action by imposing a Temporary Suspension on Kanarek, she did nothing. Had Keating notified Kanarek that pending a full investigation and a Temporary Suspension were being imposed upon her there is little doubt Kanarek's conduct would have dramatically changed, and she would have refrained from any further terrorist activities towards the Plaintiff for fear of reprisals from the USEF. Further, it is reasonable to believe that armed with an order of the USEF that Kanarek was Temporarily Suspended based upon her dangerous conduct, the local police would react differently and required Kanarek and Goodwin to vacate the Plaintiff's farm or be physically removed.

98.    Over the course of the next few days the Plaintiff spoke with Keating numerous times, each time begging her to have the USEF intervene "before somebody gets Killed" and Keating never offered any help of any kind. In addition, on August 3, 2019, the Plaintiff sent Keating a very detailed email in which he attempted to have her understand that the situation was truly a matter of life and death. Attached hereto as Exhibit "J" is a copy of the email.

99.    The most disturbing and inexcusable fact is that at no time during the numerous

conversations with the Plaintiff did Keating ever mention the Center for SafeSport, nor did she say she would refer the matter to SafeSport which she was obligated to do under the SafeSport Act and under the By-Laws of the USEF.  As previously noted, at no time did Keating make the Plaintiff aware that she could impose a Temporary Suspensions on Kanarek.

100.    Adding insult to injury, at the same time the Plaintiff reached out to Keating, he telephoned Murray Kessler ("Kessler"), who at the time was the Chief Executive Officer of the USEF.  The Plaintiff made countless telephone calls to Kessler and each time he was told by Kessler's secretary that Kessler was unavailable and despite leaving a message that it  was urgent that Kessler returned his phone call, Kessler never called the Plaintiff.

101.    In the end, the calls to the most senior officers of the USEF, which should have resulted in the immediate imposition of  a Temporary Suspension, did not motivate the USEF to act against Kanarek and the tragedy of August 7, 2019, occurred.

102.    Tragically the Plaintiff's world as he knew it came to an end on August 7, 2019.

103.    In an effort to restore some form of normalcy, end Kanarek's reign of terror and recreate a safe environment for everyone, in the early afternoon of August 7, 2019, the Plaintiff went to the apartment on his farm in New Jersey where Kanarek and Goodwin were residing.

104.    As he approached the house, Goodwin came out of the house and approached the Plaintiff.

105.    The first words spoke were those of the Plaintiff and he said "How do we end this? I don't want to go to war."  Later, during his trial testimony, Goodwin would confirm the Plaintiff first words to him and describe the Plaintiff as calm and remorseful.

106.    What happened immediately after those words were spoken is not known and probably will never be known.  But something happened that transformed a peaceful and calm

conversation between the Plaintiff and Goodwin into a crime scene.

107.    What is known is that Kanarek came out of the house with her extremely ferocious dog. There is no question that her dog was vicious since it had attacked a client of the Plaintiff the evening before inflicting serious injuries upon her.

108.    In light of the fact that by Goodwin's own trial testimony that the Plaintiff appeared at the house calm and wanting to figure out a way to end the existing difficult situation, there had to be some intervening event which changed a calm and peaceful environment into the event which followed, the shooting of Kanarek.  Since the judge at the trial did not permit any evidence regarding the behavior of the dog, it may be speculation, but it is not unreasonable to strongly suspect that this vicious dog came out of the house, attacked the Plaintiff, and in an attempt to defend himself he discharged the weapon he had brought to the house to defend himself from a dog that nearly put one of his clients in the hospital the night before.  Support for this theory is sustained by forensic evidence that established that the weapon was discharged from a position on the ground and the fact that the dog mauled the Plaintiff all over his body requiring hospitalization.  Copies of photographs taken displaying evidence of the dog's attack of the Plaintiff is attached as Exhibit "K."

109.    No evidence of any kind was offered to support the Plaintiff's arrest other than the testimony of Kanarek and Goodwin.  No forensic evidence supported the charge that the Plaintiff shot Kanarek.  The Plaintiff's hands were not even tested for gunshot residue.  And a video recording which Goodwin claimed caught the entire incident was somehow lost by Goodwin.

From the accounts of witnesses at the time and based upon the expert opinion of probably the most respected forensic psychiatrist in the U.S. and the expert opinion of a highly

esteemed psychologist, at some time before August 7, 2019, the acts of terror that Kanarek and Goodwin reigned upon the Plaintiff caused him to lose his mind and become legally temporarily insane.

110.    Approximately 2 and ½ years after the August incident, a jury would agree, that due to a mental disease or defect created by the continuous and unrelenting sadistic and terrorist conduct of Kanarek and Goodwin, the Plaintiff lacked the capacity to understand the nature and quality of his actions or that those actions were wrong at the time he manifested certain actions.  With respect to the event described, a jury determined that  the Plaintiff was incapable of either knowing what he was doing or that what he was doing was wrong and found him not guilty by reason of insanity.

111.    It is imperative that it is understood that as a matter of law the Jury could not have determined that the Plaintiff lacked the capacity to understand the nature and quality of his actions or that those actions were wrong at the time he manifested certain actions if it had not concluded that the Plaintiff's total psychiatric collapse into psychosis was the direct result of the extreme emotional abuse of  Kanarek and Goodwin.

112.    Kanarek was shot and solely based upon the words of Kanarek and Goodwin that the Plaintiff shot Kanarek, he was arrested.

113.    The Plaintiff was incarcerated at the Morris County Correctional Facility and remained there for two and one-half years until his trial in April 2022.

114.    As the result of his incarceration the Plaintiff was forced to sell his multi-million- dollar farm in New Jersey at a fire sale price.  The Plaintiff was placed under Temporary Measures by the Center for SafeSport and all his clients and the business that he had built over nearly 40 years vanished literally overnight.  In defense of the charges that he faced, he incurred millions

of dollars of legal fees. Obviously since the Plaintiff was incarcerated, he had no source of income, he found himself selling tens of thousands of dollars of equipment that was used at his New Jersey farm and in most instances the amount he recovered was far less than the actual value of the equipment.

115.    In addition to the financial and emotional burden of defending himself against criminal charges, the Plaintiff had to defend himself from two very significant lawsuits. His business partner of more than 20 years sued the Plaintiff, alleging the Plaintiff owed him hundreds of thousands of dollars from their joint business. Kanarek filed suit against the Plaintiff for the personal injuries she suffered as the result of the shooing. After considerable investment of time and significant legal fees, the lawsuit brought by the Plaintiff business partner was resolved in the Plaintiff's favor and the personal injury lawsuit brought by Kanarek was voluntarily dismissed with prejudice by Kanarek.

116.    Perhaps the worst consequence for the Plaintiff was the loss of his reputation and friends. To those in the world of Dressage, the Plaintiff was an international super star. The Plaintiff was a member of the 2008 Olympic Team, had been on the short list for three other Olympic games and had won more than 100 Grand Prix championships around the world. His reverence for the Dressage world is perhaps most evident in the fact that he is the only person in all of Olympic history to coach two different riders to Olympic medals in two different equestrian disciplines in the same Olympics.

117.    Friends, clients, and colleagues in the world of dressage that were once close to the Plaintiff disappeared. The Plaintiff through sources in the Dressage community learned that his colleagues and friends were not abandoning him because of the charges against him, but rather they were staying away because they were advised that pursuant to the SafeSport Act

any interaction with the Plaintiff could be treated as aiding and abetting a person under suspension and those friends and colleagues could be disciplined.

118.    In fact, the friends and colleagues who were familiar with the reign of terror inflicted on the Plaintiff and his girlfriend by Kanarek believed that the shooting on August 7, 2019, was due to Kanarek literally driving the Plaintiff to a psychotic mental state where he was not responsible for his acts

119.    At the trial Plaintiff's attorneys were confident that he had a very credible defense of self-defense, in addition to the defense that at the time of the shooting he was in a mental state that made him not responsible for his acts.  In a ruling that many experienced and well-respected attorneys believe was improper and inconsistent with a decision of the New Jersey Supreme Court directly on point, the Judge did not allow the Plaintiff to assert both the defense of self-defense and the defense of not being responsible due to a mental condition. The judge ruled that if he wanted to assert that he was mentally not responsible for his acts the Plaintiff could not also assert a defense of self- defense.   The Judge made the Plaintiff choose and he chose the defense that he was not mentally responsible for his acts.

120.    The trial lasted several weeks and from the verdict of the jury finding him not guilty based upon the mental condition created by Kanarek, it is reasonable to conclude that the jury believed the Plaintiff that the shooting occurred due to the horrific and terrorizing actions directed at him by Kanarek and Goodwin.  After 2 and ½ years of incarceration the jury found the Plaintiff to be suffering from mental insanity and not guilty due to a mental condition that made him not responsible for his acts.

121.    As pleased as the Plaintiff was by the jury's verdict, his nightmare was not yet over.

122.    It is mandated by New Jersey law that if a person is found not guilty due to a mental

condition they must be confined in a state mental health facility until it can be determined by the physicians at the facility and approved by the trial judge that the Plaintiff no longer suffers from the mental condition which was the basis of the jury's not guilty verdict and he is not a threat to the community and could function in society.

123.   On May 13, 2022, the Plaintiff was transferred from the Morris County Correctional Facility to the Anne Klein Forensic Center in Trenton, New Jersey to begin his treatment for the mental condition which had caused his psychosis.

124.   The Plaintiff remained the Anne Klein Forensic Center until October 12. 2022 and then was transferred to the Greystone Park Psychiatric Hospital in Parsippany-Troy Hills, New Jersey. He remained incarcerated at that facility until November 20, 2023, when it was determined by the physicians at Greystone Park Psychiatric Hospital and the trial judge that he could return to society he was finally released but the Plaintiff was prohibited from leaving the State of New Jersey.  Therefore, he was unable to return to his home in Loxahatchee, Florida.

125.   It was not until September 2024 that the judge allowed the Plaintiff to return to his home in Florida.

126.   As of the writing of this Complaint, the Plaintiff's life is still under the control of the trial judge, and he has no idea when he will finally be able close this tragic and dreadful chapter of his life.

### CLAIMS FOR RELIEF

### COUNT I

### BREACH OF ORGANIZATIONAL RULES

127.   The Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through  126 as if fully set forth herein.

128.    As set forth above, despite receiving timely and detailed reports describing conduct that clearly violates USEF's Governing Documents, including published rules and member protection standards, USEF failed to take appropriate action, initiate required procedures, or enforce its disciplinary mechanisms, thereby breaching its obligations to protect the Claimants and the Plaintiff, and maintain a safe and ethical equestrian environment.

129.    USEF is the National Governing Body for Equestrian Sport in the United States and is responsible for enforcing its Governing Documents and SafeSport policies, and member discipline procedures.

130.    USEF's Governing Documents expressly empower and obligate the organization to investigate and act when a member is accused of conduct detrimental to the safety, well-being, integrity, or rights of other members, including the Plaintiff.

131.    The actions—and failures to act—described herein fall squarely within the scope of USEF's jurisdiction and disciplinary authority.

132.    The Plaintiff was a member in good standing in August 2019.  Kanarek was a member in August 2019 and was subject to USEF Governing Documents the SafeSports Act, and disciplinary procedures in August 2019.

133.    As set forth in detail above, the Plaintiff and Complainants were subjected to repeated instances of:

- o   Bullying
- o   Harassment
- o   Stalking
- o   Verbal and/or written abuse
- o   Threatening behavior
- o   Conduct intended to intimidate, harm, or cause emotional distress.

134.    These behaviors constitute clear violations of USEF's: Governing Documents:

- o      Rule Book (including Member Conduct and Welfare provisions)
- o      Code of Conduct

- o    SafeSport / Athlete Protection policies
- o    Ethical standards governing member behavior.

135.    USEF Bylaws Part VII governs complaints and disputes administered by the USEF and its Hearing Committee. Bylaw 701.3 authorizes the USEF's Regulation Department to administer and oversee complaints and to promulgate supplemental procedures.

136.    USEF has published *Supplemental Procedures for Grievances and Complaints* to implement Bylaws Part VII and Bylaw 701.3.

137.    USEF's Rulebook delegates investigation and enforcement to the Regulation Department and Hearing Committee, with violations and penalties set out in the General Rules (Chapters 6–7).

138.    USEF's SafeSport Policy prohibits bullying, harassment, hazing, and other forms of abuse, and states these policies are enforced under the General Rules and Hearing Committee jurisdiction.

139.    USEF's Code of Conduct sets expectations for members, licensed officials, participants, owners, coaches, competition organizers, and others to act as ambassadors of the sport and not engage in conduct detrimental to the sport or USEF's reputation.

140.    GR609 Temporary Suspension of the Rulebook provides that in connection with any charge, or any other matter which may properly fall within the jurisdiction of the Hearing Committee of the USEF, and upon a determination that considerations involving the health, safety or welfare of USEF members warrant prompt action pending consideration of the matter by the Hearing Committee, the CEO of the USEF or his designee may temporarily suspend any person from participating in any manner in the affairs of the Federation until the Hearing Committee can hear the matter.

141.    As detailed above, on or about March/April 2018 the Claimants reported Kanarek's

conduct to USEF through the required channels, providing detailed descriptions, supporting documentation, and requests for assistance.

142.    As detailed above, on August 1, 2019, the Plaintiff reported Kanarek's conduct to USEF through the required channels, providing detailed descriptions, and requests for assistance.

143.    USEF acknowledged receipt of the report from the Claimants and the Plaintiff and in both instances failed to take appropriate, timely, or required action.

144.    By not timely administering the complaint in accordance with the Bylaws and the published supplemental procedures, the USEF failed to exercise its mandated oversight role.

145.    By not timely administering the complaint in accordance with Section 701.3 of the Bylaws and the published supplemental procedures, the USEF failed to exercise its mandated oversight role.

146.    USEF's "Reporting and Processes" page states that, after intake, the USEF "will initiate a fact-gathering investigation" (including witness interviews and evidence collection). USEF failed to initiate these steps in each case described herein.

147.    USEF SafeSport materials and FAQs identify bullying, harassment, and hazing as prohibited conduct.  By failing to act on a detailed report, USEF did not enforce its own Safe Sport Policy.

148.    The Code of Conduct obligates members and participants to act in a manner that does not bring embarrassment to USEF or the sport and to promote a positive environment and good sportsmanship.  USEF's inaction allowed ongoing Code violations to persist unchecked.

149.    The SafeSport Policy Handbook states that enforcement of its policies falls under the General Rules Chapters 6–7 (violations and penalties) overseen by the Hearing Committee. USEF did not progress my report to these enforcement avenues.

150.    USEF's "Reporting and Processes" page states that, after intake, the USEF "will initiate a fact-gathering investigation" (including witness interviews and evidence collection).  USEF failed to initiate these steps in the case of the Complainants and the Plaintiff.

151.    GR 609 provides that upon a determination that considerations involving the health, safety or welfare of USEF members warrant prompt action, the CEO of the USEF or his designee may temporarily suspend any person from participating in any manner in the affairs of the USEF until the Hearing Committee can hear the matter.  Despite the imminent, the clear, imminent danger to the health, safety and welfare of the Complainants and the Plaintiff, nether Keating nor Kessler took any action to protect the Plaintiff.

152.    As a result of USEF's inaction with respect to the Complainants, despite the fact that it was foreseeable that Kanarek's abusive conduct would continue and other members of the USEF would be harmed by Kanarek, including the Plaintiff, Kanarek's abusive conduct continued and the Plaintiff was exposed to ongoing harm, emotional distress, reputational damage, and an unsafe environment within USEF-sanctioned activities.

153.    USEF's inaction to address the dangerous and abusive conduct of Kanarek caused, and to this date continues to cause, the Plaintiff emotional distress, lost training/competition opportunities, reputational harm, financial costs, and has emboldened Kanarek to continue abusive conduct. Without the implementation and enforcement of temporary protections against Kanarek she continues to pose a danger to not only the Plaintiff but based upon her history of tormenting and terrorizing even strangers, the members of the USEF continue to be in danger from Kanarek.

154.    Plaintiff has fully complied with all obligations required under the Governing Documents, including paying dues and abiding by USEF's rules.

155.    As a direct and proximate result of USEF's breach, Plaintiff suffered damages in an amount to be proven at trial.

**COUNT II**

**BREACH OF CONTRACT**

156..    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 155 as if fully set forth herein.

157.    At all relevant times, the  Complainants and Plaintiff were all members of the USEF.

158.    Upon becoming a member of the USEF, the Plaintiff entered into a contractual relationship with the USEF, the terms of which are embodied in the Governing Documents.

159.    As a membership organization, USEF requires all members to agree to abide by USEF's Governing Documents.

160.    The contractual relationship created between USEF and each of its members imposes obligations and gives rights to the members and to the USEF.  Members pay dues and submit to USEF's authority in exchange for USEF's agreement to administer rules, disciplinary procedures, hearings, and membership benefits fairly, consistently, and in accordance with its written policies.

161.    USEF expressly represents that it will follow its written procedures in matters including but not limited to rule enforcement; disciplinary investigations; hearing procedures; grievance handling; ethical-conduct determinations; rule book application and interpretation.  In that regard the Governing Documents specifically provide that the USEF is required to investigate all reports of harmful or abusive conduct by one member against another, and, where such conduct is substantiated, to impose appropriate sanctions upon the offending member.  The Governing Documents also require the USEF, when appropriate, to report certain improper

conduct to the Center for SafeSport.

162.    Plaintiff reasonably relied on USEF's representations that it would follow these procedures as written and uniformly apply its rules to all members.

163.    The duty to investigate and sanction harmful member conduct and to forward reports of certain improper conduct to the Center for SafeSport is an essential term of the Membership Agreement, intended to ensure the safety and well-being of all members, including Plaintiff.

164.    As reflected above, prior to the incident involving Plaintiff,  the USEF received multiple reports that Kanarek had engaged in harmful and improper conduct toward another members of the USEF on several separate occasions.

165.    Each such report was made by each of the Claimants pursuant to the procedures set forth in the Governing Documents.

166.    Despite its clear contractual obligation to do so, the USEF failed and refused to investigate any of the Claimants reports concerning Kanarek and likewise failed to impose any sanctions upon Kanarek.  Neither did the USEF forward these complaints to the Center for SafeSport which it was obligated to do if it did not assume jurisdiction for these complaints.

167.    As a result of the USEF's continued inaction, Kanarek's harmful conduct progressed and continued unchecked, creating a foreseeable risk that other members, including the Plaintiff, would be subjected to the same or similar harmful behavior.

168.    The USEF knew or reasonably should have known that its failure to investigate and sanction Kanarek would embolden her to continue engaging in harmful conduct and would expose other members to foreseeable harm.

169.    Approximately one year after the initial reports by the Complainants, Kanarek engaged in substantially similar harmful conduct toward Plaintiff.

169.    Plaintiff promptly reported Kanarerk's conduct to the USEF pursuant to the Governing Documents.

170.    Despite the repeated nature of Kanarek's conduct and the foreseeability of continued harm to other members, the USEF once again failed and refused to investigate Plaintiff's report or impose any sanction upon Kanarek.

171.    The USEF's repeated failure to investigate and sanction Kanarek's harmful conduct, beginning in the Spring of 2018 and continuing until August 2019 constitutes a material and ongoing breach of its contractual obligations under the Governing Documents.

172.    As a direct and proximate result of the USEF's continuous and ongoing breach of contract, Plaintiff was harmed and suffered damages, including but not limited to physical, emotional, and/or psychological injury, loss of enjoyment of the USEF's activities, and other consequential damages.

173.    The specific facts set forth in the preceding paragraphs support and establish that the USEF failed to abide by its own Governing Documents in connection with the events described herein, including but not limited to:

- Failing to follow established procedures outlined in the By-laws;
- Deviating from or disregarding the Code of Conduct;
- Misapplying, inconsistently applying, or ignoring specific Rulebook provisions;
- Conducting disciplinary or administrative actions in a manner contrary to its published rules;
- Failing to provide the procedural protections, notice, or fairness required by the Governing Documents.
- Failure to make a referral to the Center for SafeSport.

174.    These actions constituted a breach of the contract created between the USEF and the Plaintiff through the Governing Documents.  As noted, the USEF's breach was particularly egregious given that it had prior notice of Kanarek's pattern of harmful conduct through multiple reports from the Complainants over a year period.  The USEF's continued inaction

despite the foreseeable risk that Kanarek would harm other members demonstrates a complete abandonment of its contractual duties.

175.    Plaintiff has fully complied with all obligations required under the Governing Documents, including paying dues and abiding by USEF's rules.

176.    As a direct and proximate result of USEF's breach, Plaintiff suffered damages in an amount to be proven at trial.

## COUNT III

## BREACH OF IMPLIED COVENANT OF GOOD FAITH

## AND FAIR DEALING

177.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 176 as if fully set forth herein in their entirety

178.    New York law implies a covenant of good faith and fair dealing in every contract.

179.    As detailed by the facts set forth above, the USEF acted in bad faith and in an arbitrary, capricious, and pretextual manner by ignoring its own rules, applying them selectively, or acting inconsistently with the reasonable expectations of its members.

180.    USEF's conduct deprived Plaintiff of the benefits of the membership contract.

181.    As the result of USEF's conduct Plaintiff suffered damages in an amount to be determined at trial.

## COUNT IV

## NEGLIGENCE

## FAILURE TO ENFORCE USEF BY-LAWS, RULEBOOK

## AND CODE OF CONDUCT

182.    The Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 181

as if fully set forth herein.

183.    USEF owed Plaintiff a duty of reasonable care, including but not limited to the duty to:

    a. promulgate and maintain adequate rules, policies, and procedures for the safety and protection of participants;
    b. reasonably apply, enforce, and implement the protections contained in its Governing Documents;
    c. reasonably investigate complaints and reports of violations;
    d. take reasonable steps to prevent foreseeable harm arising from violations of its Governing Documents; and
    e. refrain from acting in ways that increased the risk of harm to Plaintiff beyond that inherent in equestrian sport.
    f.  failure to refer the complaint to the Center for SafeSport.

184.    By adopting and publishing the Governing Documents, promoting them to its membership, and requiring compliance as a condition of participation in USEF-sanctioned activities, USEF voluntarily undertook to provide protective measures and therefore assumed a duty to exercise reasonable care in carrying out that undertaking.

185.    USEF breached its duties to Plaintiff in multiple ways, including but not limited to:

    a. failing to implement and follow its reporting, investigative, and disciplinary procedures as written;0
    b. failing to act upon credible complaints or reports of misconduct, rule violations, or unsafe conditions;
    c. failing to enforc0e its code of conduct and safety-related rules against individuals and/or entities whose conduct violated the Governing Documents;
    d. failing to warn Plaintiff of known or reasonably knowable risks created by such violations; and
    e. tolerating, condoning, or ignoring conduct and conditions contrary to the protections promised in the Governing Documents.
    f.  failure to refer the complaints to the Center for SafeSport.

186.    USEF's acts and omissions fell below the standard of care that a reasonably prudent national governing body, in like circumstances, would exercise in applying and enforcing its own bylaws, rulebook, and code of conduct.

187.    USEF's negligence, as described above, was a direct and proximate cause of the injuries and damages suffered by Plaintiff.

188.    As a direct and proximate result of USEF's negligence, Plaintiff has sustained and continues to sustain injuries and damages, including, but not limited to:

a. physical pain and suffering;
b. emotional distress and mental anguish;
c. medical expenses and costs of treatment;
d. lost earnings, lost earning capacity, and/or lost opportunities; and
e. other economic and non-economic damages in an amount to be proven at trial.

189.    USEF's conduct was reckless, willful, and/or in conscious disregard of Plaintiff's safety and rights, thereby justifying an award of punitive and/or exemplary damages in an amount sufficient to punish and deter such conduct, to the extent permitted by applicable law.

190.    As a consequence of the negligence of the USEF, the Plaintiff, the Plaintiff was damaged in an amount to be determined at trial.

## COUNT V

## BREACH OF FIDUCUARY OBLIGATIONS

191.    The Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 177 as if fully set forth herein.

192.    A fiduciary relationship existed between the USEF and the Plaintiff.

193.    The fiduciary relationship existed because the Plaintiff, as do all members of the USEF, placed his trust and confidence in the USEF that it will exercise a duty of care with respect to the welfare of the Plaintiff and all members.

194.    The Plaintiff, and all members, believe that the expertise and authority of the USEF was such that it would exercise its duty of care and protect the Plaintiff from the harm that was subjected to by the actions of Kanarek and Goodwin.

195.    The USEF breached its fiduciary obligations to the Plaintiff in that it did not exercise its duty of care and protect the Plaintiff from the actions of Kanarek and Goodwin.

196.    As a consequence of the failure of the USEF to meet its fiduciary obligations for the

benefit of the Plaintiff, the Plaintiff has been damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully request this Court award the Plaintiff

compensatory damages together with interest and costs of suit; punitive damages;

attorney's fees; and .such other and further relief as this' Court deems Just and proper.

Respectfully submitted,

_____

Steven M. Tarshis
991 US Highway 22 West,
Suite 100
Bridgewater, New Jersey 08807
Tel: (908) 713-9229
Email: steven@smtesq.com