UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL BARISONE,

Plaintiff,

– *against* –

UNITED STATES EQUESTRIAN FEDERATION,

Defendant.

**OPINION & ORDER**

25-cv-07458 (ER)

RAMOS, D.J.:

Michael Barisone brings this action against the United States Equestrian Federation (the "USEF") arising out of USEF's alleged failure to investigate and take disciplinary action against a fellow USEF member who he alleges harassed and threatened him over a period of seventeen months. Doc. 21. Specifically, he alleges breach of the organization's disciplinary rules, breach of contract, breach of implied covenant of good faith and fair dealing, negligence, and breach of fiduciary duty. *Id.* Pending before the Court is USEF's motion to dismiss the amended complaint in its entirety. Doc. 22. For the reasons stated below, the motion is GRANTED.

## I. BACKGROUND

### A. Factual Background

The following facts are based on the allegations in the Amended Complaint, which the Court accepts as true for purposes of the instant motion. *See, e.g., Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

Barisone is an accomplished dressage rider and coach, *see* Doc. 21 ¶ 14, described in the amended complaint as an "international super star" in the dressage community, *id.* ¶ 116. He is a former member and director of USEF. *Id.* ¶¶ 14, 95. Barisone owned and operated equestrian training facilities in New Jersey and Florida. *Id.* ¶ 14.

USEF serves as the national governing body for equestrian sport in the United States pursuant to its certification under the Ted Stevens Olympic and Amateur Sports Act (the "Amateur Sports Act"), 36 U.S.C. § 220501 *et seq*. Doc. 21 ¶ 6. As a national governing body, USEF is subject to certain obligations under the Amateur Sports Act, including responsibilities relating to athlete safety and the establishment of procedures for resolving disputes involving athletes, sports organizations, and governing bodies. *Id.* ¶ 7.

In 2017, Congress enacted the Protecting Young Victims from Sexual Abuse and SafeSport Authorization Act of 2017 (the "SafeSport Act"), which established the Center for SafeSport. *Id.* ¶¶ 8–9. Pursuant to the SafeSport Act, national governing bodies, such as USEF, are required to report certain categories of abusive conduct to the Center for SafeSport. *Id.* ¶ 10. Where allegations involve misconduct of a sexual nature, the national governing body must refer the matter to the Center for SafeSport, which must then assume jurisdiction. *Id.* ¶ 11. Where the allegations involve non-sexual misconduct, the Center for SafeSport's jurisdiction is discretionary and the relevant national governing body handles the offense pursuant to its own governing documents, unless and until the Center for SafeSport chooses to exercise jurisdiction. *Id.*

The amended complaint further alleges that USEF's Bylaws, General Rulebook, and Code of Conduct (collectively, the "Governing Documents") prescribe mandatory procedures governing complaints brought by one USEF member against another USEF member for alleged violations of the Governing Documents, including allegations of bullying, harassment, or other prohibited conduct. *Id.* ¶ 12. Specifically, the amended complaint alleges that, upon receipt of a non-sexual misconduct complaint, USEF Bylaws Article 703.3 and General Rule GR605 require USEF to conduct an investigation and, where appropriate, initiate disciplinary proceedings against any member alleged to have engaged in conduct detrimental to the integrity or welfare of the sport. *Id.* ¶ 13.

Beginning "sometime during 2017 or 2018," *id.* ¶ 37, the amended complaint alleges that three individuals reported to USEF that Lauren Kanarek, an equestrian athlete and USEF member, had engaged in harassing, threatening, or abusive conduct. *Id.* ¶¶ 20, 37, 42.

Specifically, Kathryn Parkinson, a USEF member, reported that she briefly worked for Kanarek in or around 2016 before quitting because Kanarek was verbally abusive and regularly exhibited outbursts of violent rage towards her. *Id.* ¶ 19. The amended complaint alleges that Kanarek subsequently "waged a war of vengeful and merciless conduct towards" Parkinson through text messages and social media. *Id.* In April 2018, Parkinson reported this conduct to Emily Pratt, director of the USEF Regulation Department, and submitted supporting documentation. *Id.* ¶¶ 25–26. Pratt responded advising Parkinson that the materials had been forwarded to USEF's legal department. *Id.* ¶ 27. After receiving no further response from anyone at USEF, Parkinson sent follow-up emails to Pratt in October and November 2018, advising that the alleged harassment was ongoing and asking whether USEF intended to take any action. *Id.* ¶¶ 29, 31. The amended complaint alleges that Parkinson has never received a response. *Id.* ¶ 32.

Robin Breuckmann, a paralympic equestrian and USEF member, reported that she provided riding lessons to Kanarek in or around 2016. *Id.* ¶ 33–34. According to the amended complaint, after becoming dissatisfied with the lessons, Kanarek began making "very abusive, threatening, and vulgar statements" towards Breuckmann and posting threatening comments about her on social media. *Id.* ¶ 35. In 2017 or 2018, Breuckmann reported this conduct to USEF and was directed to send supporting materials documenting the alleged conduct to Pratt, which she did. *Id.* ¶ 37. The amended complaint alleges that Breuckmann has never received a response. *Id.* ¶ 38.

Josephine Stagaard, who "is not a horse person and has nothing to do with anything equestrian," *id.* ¶ 39, reported that she had been subjected to harassment, cyber

bullying, and threats by Kanarek since 2015, despite never having met her. *Id.* ¶¶ 41, 43. She speculates that Kanarek targeted here because Kanarek had dated Stagaard's then current fiancée approximately twenty years earlier and that "Kanarek was jealous of that relationship." *Id.* ¶ 44. In particular, the alleged harassment concerned Stagaard's young son who had died in a drowning accident at a swimming pool in 1999. *Id.* ¶ 52. The amended complaint alleges that Kanarek made social media posts stating that Stagaard was a murderer who had killed her child, and even accused her of having "engaged in a deviant sexual act" at the time of her son's drowning. *Id.* ¶ 46. In April 2018, Stagaard reported the conduct to Sarah Gilbert, then a legal assistant at USEF, and then to Pratt, submitting hundreds of examples of what she described as threatening and harassing messages. *Id.* ¶¶ 42–43, 51–52. The amended complaint alleges that neither Pratt nor anyone else at USEF responded. *Id.* ¶ 53.

Kanarek became a client of Barisone in early 2018, initially arranging to train at Barisone's Florida facility for the month of March 2018. *Id.* ¶ 63. She subsequently sought to continue training at Barisone's New Jersey facility, and Barisone agreed. *Id.* ¶¶ 69–70. Barisone also permitted Kanarek and her boyfriend, Rob Goodwin, to stay temporarily in the vacant apartment in a home located on the New Jersey facility. *Id.* ¶¶ 70–71. The amended complaint alleges that Barisone expressly advised Kanarek that the arrangement was temporary and could be terminated at any time. *Id.* ¶ 71. Barisone and his girlfriend lived in a separate apartment within the same house. *Id.* ¶ 91.

According to the amended complaint, the behavior of Kanarek and Goodwin became increasingly "unstable" over the course of fall 2018 through summer 2019. *Id.* ¶ 78. Barisone alleges that Kanarek would often scream and curse at others on the farm and disregard barn rules by entering the stables after hours. *Id.* He alleges that he "lived

in constant fear" for his own safety, the safety of his girlfriend and her children,[1] and further believed that Kanarek and Goodwin would burn down his farm and cause harm to the horses. *Id.* ¶ 79.

Kanarek became fixated on one of Barisone's horses, "Jay-T." *Id.* ¶ 72. And, in December 2018, Kanarek purchased Jay-T from Barisone at a price substantially below its alleged market value after she threatened to cause physical harm to Barisone, his farm, his horses, and file a lawsuit against him. *Id.* ¶ 80.

As he did every year, Barisone relocated to his Florida facility for the winter equestrian season in January 2019. *Id.* ¶ 81. At this time, while Barisone was in Florida, a pipe froze in his New Jersey home, rendering both apartments unhabitable. *Id.* ¶ 82–83. When Barisone informed Kanarek that she would need to find alternative housing, he alleges that she became angry, "screamed and cursed" at him, and threatened to report him for insurance fraud.[2] *Id.* ¶ 83.

Thereafter, Barisone alleges that he repeatedly attempted to have Kanarek and Goodwin vacate his New Jersey farm, but each time Kanarek refused and further threatened to cause physical harm to Barisone, his girlfriend, his farm, and his horses, as well as file lawsuits against him. *Id.* ¶ 84. Barisone alleges that he contacted the local police on multiple occasions to have Kanarek and Goodwin removed from his property but was told that the dispute was civil in nature and that the police therefore would not intervene. *Id.* ¶ 85.

By mid-March 2019, Kanarek's behavior had become "disturbingly violent and irrational." *Id.* ¶ 86. It was around this time that Barisone first learned that Kanarek had

---

[1] The amended complaint alleges that a review of Kanarek's online search history revealed that she had searched for the location of Barisone's girlfriend's children and that "immediately after locating the children, Kanarek searched online for extremely devastating and potent forms of ammunition for the handgun [Barisone] knew [Kanarek] possessed." Doc. 21 ¶ 79.

[2] The amended complaint alleges that the insurance carrier determined that the burst pipe was an accident. Doc. 21 ¶ 83.

been prescribed an anti-psychotic medication, which she elected to stop taking. *Id.* Kanarek's mother came to the farm to watch her daughter ride, and during the lesson Kanarek allegedly "lost her temper and exploded, calling her mother an assortment of extremely vile and repulsive names." *Id.* Kanarek's mother then asked her whether she was taking her anti-psychotic medication, to which Kanarek responded "Of course not. It makes me fat." *Id.*

Barisone alleges that Kanarek subsequently began posting "contemptible, disturbing, and threatening" statements about Barisone and his girlfriend on social media, such as accusing him of being "an adulterer, drug addict, pervert, cheat, horse abuser, and thief." *Id.* ¶ 90. And that Kanarek further made "veiled, but very obvious threats of physical harm to [Barisone] and his girlfriend and even threatening to kill [Barisone]." *Id.*

Barisone alleges that at this point his mental and emotional condition had deteriorated significantly. *Id.* ¶¶ 85, 89. He allegedly became unable to perform the necessary functions to care for his farm and horses. *Id.* ¶ 89. He was unable to sleep, neglected his personal hygiene, moved out of his apartment and into a barn lounge, and began patrolling the property throughout the night armed with a baseball bat out of fear that Kanarek or Goodwin would damage the property or harm the horses. *Id.* ¶ 91–92.

Barisone alleges that he "believed that the USEF . . . had the power to intervene" and put a stop to Kanarek's "reign of terror." *Id.* ¶ 94. Accordingly, Barisone allegedly contacted USEF Chief Operating Officer and General Counsel Sonja Keating on multiple occasions in August 2019, seeking assistance. *Id.* ¶¶ 95, 98. Barisone alleges that he informed Keating that he believed the situation posed an imminent danger to himself and others and requested that the USEF intervene. *Id.* ¶ 98. The amended complaint alleges that Keating suggested that Barisone contact the police but that she did not temporarily suspend Kanarek, initiate an investigation, or refer the matter to SafeSport. *Id.* ¶¶ 97, 99. Barisone also alleges that he repeatedly attempted to contact Murray Kessler who was, at

the time, the Chief Executive Officer of USEF, but that each time Kessler's secretary told him that Kessler was unavailable, and that, despite leaving a message, Kessler never returned his calls. *Id.* ¶ 100.

On August 7, 2019, Barisone approached the apartment occupied by Kanarek and Goodwin in what the amended complaint characterizes as an attempt to "restore some form of normalcy, end Kanarek's reign of terror and recreate a safe environment for everyone." *Id.* ¶ 103. In a "calm and remorseful" manner, Barisone said to Goodwin, "How do we end this? I don't want to go to war." *Id.* ¶ 105. At which point Kanarek came out of the apartment with her "extremely ferocious dog." *Id.* ¶ 107. The situation escalated, and Barisone shot Kanarek. *Id.* ¶ 108.

Barisone was subsequently arrested and remained incarcerated for approximately two and a half years pending trial. *Id.* ¶¶ 112–13. His trial occurred in April 2022 where a New Jersey jury found him not guilty by reason of insanity. *Id.* ¶ 110, 113. Barisone alleges that pursuant to New Jersey state law an individual found not guilty by reason of a mental condition must be committed to a state psychiatric facility and remain confined until physicians at the facility determine, and the trial judge concurs, that the individual no longer suffers from the mental condition underlying the verdict, does not pose a danger to the community, and can safely function in society. *Id.* ¶ 122. Barisone was transferred from the Morris County Correctional Facility to the Anne Klein Forensic Center in Trenton, New Jersey, in May 2022, where he remained until October 2022, when he was transferred to the Greystone Park Psychiatric Hospital in Parsippany-Troy Hills, New Jersey. *Id.* ¶¶ 123–24. Barisone was released from the Greystone Park Psychiatric Hospital in November 2023 but remains subject to some restrictions imposed by the trial judge. *Id.* ¶¶ 124–26.

Barisone alleges that as a result of shooting Kanarek, the ensuing criminal proceedings, and his involuntary institutionalization, he suffered severe financial, professional, and reputational harm. He alleges that he incurred millions of dollars in

legal fees and was forced to sell his New Jersey farm and equipment at reduced prices. *Id.* ¶ 114. Barisone further alleges that the Center for SafeSport imposed temporary measures against him and that, as a result, the business he had built over almost forty years "vanished literally overnight." *Id.* He also alleges to have lost standing within the sport because friends, clients, colleagues, and others in the equestrian community were allegedly warned that continued interaction with him could subject them to discipline under the SafeSport Act. *Id.* ¶ 116–17.

**B. Procedural Background**

Barisone initially filed this action on July 31, 2025, in the United States District Court for the District of New Jersey. *See* Doc. 1. On September 8, 2025, the court entered a stipulation and order transferring the case to the Southern District of New York. Doc. 8.

On November 25, 2025, Barisone filed an amended complaint. Doc. 21. The amended complaint alleges five counts: (1) breach of USEF's Governing Documents; (2) breach of contract; (3) breach of implied covenant of good faith and fair dealing; (4) negligence; and (5) breach of fiduciary obligations. *Id.* ¶¶ 127–96.

On December 19, 2025, USEF filed the instant motion to dismiss the amended complaint in its entirety with prejudice. Doc. 22. USEF argues that most, if not all, of the claims are barred by the applicable statute of limitations, and further contends that three of the claims are duplicative of the breach of contract cause of action. Doc. 23 at 8. In addition, USEF argues that the breach of its Governing Documents claim should be dismissed because it fails to allege legally cognizable harm or damages and does not plausibly allege that USEF breached any obligations under its Governing Documents, *id.* at 15–21; that the breach of contract claim should be dismissed because it likewise fails to allege any legally cognizable harm or damages and does not plausibly allege that USEF breached any of its contractual obligations, *id.* at 21–24; that the breach of implied covenant of good faith and fair dealing claim should be dismissed because it fails to

sufficiently allege that USEF exercised its contractual rights and obligations in an arbitrary, irrational, or bad faith manner, *id.* at 24–25; that the negligence claim should be dismissed because USEF owed no legal duty to Barisone and because the actions of both Barisone and Kanarek constitute unforeseeable superseding causes, *id.* at 26–31; and that the breach of fiduciary duty claim should be dismissed because USEF owed no fiduciary duty to Barisone, *id.* at 31–32. In support of its motion, USEF filed a request for judicial notice of certain external documents. Doc. 27.

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the amended complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Koch*, 699 F.3d at 145. However, the Court is not required to credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

The question in a Rule 12(b)(6) motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose

of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without regard for the weight of the evidence that might be offered in support of the plaintiff's claims. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)). Furthermore, "only a complaint that states a plausible claim for relief survives a motion to dismiss" and "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

**B. External Documents**

In resolving a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials extrinsic to the complaint. Fed. R. Civ. P. 12(d). However, that rule is not absolute. Although the court is generally "confined to the allegations contained within the four corners of [the] complaint" in deciding a Rule 12(b)(6) motion, the court "may also consider any documents attached to the complaint as an exhibit or incorporated in it by reference," *Carlin v. Davidson Fink LLP*, 852 F.3d 207, 212 (2d Cir. 2017) (internal quotations omitted), "matters of which judicial notice may be taken under Fed.R.Evid. 201," *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991), or documents the plaintiff relied on in drafting the complaint, *Chambers v. Time Warner, Inc*., 282 F.3d 147, 153 (2d Cir. 2002).

The Court "need not accept as true any allegations that are contradicted by documents deemed to be part of the complaint, or materials amenable to judicial notice." *In re MBIA, Inc., Securities Litigation*, 700 F. Supp. 2d 566, 576 (S.D.N.Y. 2010).

## III. DISCUSSION

### A. Judicial Notice of External Documents

USEF attaches six documents to the Declaration of Sonja S. Keating in support of its motion to dismiss. Doc. 25.

- The USEF Bylaws, effective May 15, 2019 (the "2019 Bylaws").
- The USEF General Rulebook, effective as of January 1, 2019.
- The USEF Bylaws, effective January 25, 2025 (the "2025 Bylaws").
- The USEF Code of Conduct, effective July 1, 2025.
- The USEF Safe Sport Policy, effective May 1, 2019.
- The 2019 SafeSport Code, effective April 15, 2019.

USEF attaches five documents to the Declaration of Catherine H. Friesen in support of its motion to dismiss. Doc. 26.

- The electronic docket report for a case filed by Barisone on July 15, 2025, against Washington Township and eleven police officers in the Superior Court of New Jersey, *Barisone v. Washington Township*, MRS-L-1562-21 (Sup. Ct. N.J. July 15, 2021).
- The electronic docket report for a case filed by Barisone on April 10, 2023, against Farm Family Casualty Insurance Company, American National Insurance, and others, in the Superior Court of New Jersey, *Barisone v. Farm Family Casualty Insurance Co.*, MRS-L-618-23 (Sup. Ct. N.J. Apr. 10, 2023). On May 11, 2023, the case was removed to the District of New Jersey, *Barisone v. Farm Family Casualty Insurance Co.,* 23-cv-02571 (D.N.J. May 11, 2023).
- The electronic docket report for a case filed by Barisone on February 10, 2025, against the State of New Jersey, Greystone Psychiatric Hospital, and others, in the superior Court of New Jersey, *Barisone v. The State of New Jersey*, MRS-L-00358-25 (Sup. Ct. N.J. Feb. 10, 2025).
- The electronic docket report for a case filed by Kanarek against Barisone, in which he filed an answer with counterclaims on March 2, 2020, *Kanarek v. Barisone*, MRS-L-002250-19 (Sup. Ct. N.J. Oct. 18, 2019).

The amended complaint cites extensively to, and is premised largely upon, USEF's Bylaws, General Rulebook, Code of Conduct, Safe Sport Policy, and the SafeSport Code. Although Barisone does not specify which version of each document he relies upon, nor does he attach any of them as exhibits to the complaint, these documents

are nonetheless properly before the Court as incorporated by reference. *See Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 691 (S.D.N.Y. 2011) (noting that to be incorporated into the complaint by reference, "the [c]omplaint must make a clear, definite and substantial reference to the documents") (internal quotations and citation omitted). Because Barisone does not identify a particular version, the Court considers the versions submitted by USEF that were in effect at the time of the relevant conduct. Barisone also does not raise objection to the Court's consideration of the attached USEF documents and SafeSport Code.

The Court may also take judicial notice of filings in federal and state court. *See* Fed. R. Evid. 201(b); *see also United States v. Miller*, 626 F.3d 682, 687 n.3 (2d Cir. 2010); *Global Network Communications*, 458 F.3d at 157; *Chambers*, 282 F.3d at 153. The Court accordingly takes judicial notice of the state and federal court docket reports submitted by USEF. *See Kramer*, 937 F.2d at 774 (noting that "courts routinely take judicial notice of documents filed in other courts . . . not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings"). Barisone also does not raise objection to the Court's consideration of the attached court documents.

**B. Choice of Law**

A federal court sitting in diversity applies the choice-of-law rules of the forum state. *Thea v. Kleinhandler*, 807 F.3d 492, 497 (2d Cir. 2015) (citing *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012)).

Under New York choice-of-law principles, courts "generally enforce choice-of-law clauses, because contracts should be interpreted so as to effectuate the parties' intent." *AEI Life LLC v. Lincoln Benefit Life Company*, 892 F.3d 126, 132 (2d Cir. 2018) (internal quotations and citations omitted). A New York choice-of-law provision "demonstrates the parties' intent that courts not conduct a conflict of laws analysis," thereby "obviat[ing] the application of both common-law conflict-of-laws principles and

statutory choice-of-law directives. *Ministers & Missionaries Benefit Board v. Snow*, 26 N.Y.3d 466, 468 (2015). Importantly, "a choice-of-law provision bears primarily on the substantive law that a court applies, not the procedural law." *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 397 (S.D.N.Y. 2019) (emphasis omitted) (collecting cases).

Here, USEF's Bylaws provide that "[t]he construction and application of [the] bylaws and rules are governed by the laws of the State of New York." Doc. 25-1 at 34; *see also* Doc. 25-2 at 64. Further, "[t]he parties' briefs assume that New York substantive law governs . . . and such implied consent is, of course, sufficient to establish the applicable choice of law." *Golden Pacific Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001) (citing *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)). Accordingly, claims predicated on the Governing Documents are governed by New York substantive law.

New York courts are nonetheless reluctant to construe choice-of-law provisions broadly to encompass non-contractual claims. *Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc.*, 414 F.3d 325, 334–35 (2d Cir. 2005); *see also Lazard Freres & Co. v. Protective Life Insurance Co.*, 108 F.3d 1531, 1540 (2d Cir. 1997) (stating that under New York law "a contractual choice of law provision governs only a cause of action sounding in contract, not one sounding in tort"). Accordingly, to the extent any claims arise independently of the Governing Documents, the Court must conduct a separate conflict-of-law analysis as to those claims.

**C. Timeliness**

USEF argues that most, if not all, claims are time-barred. Doc. 23 at 8. While, as discussed above, New York substantive law applies, under New York choice-of-law principles, "statutes of limitations are characterized as procedural, which means New York's statutes of limitations apply even if the substantive law of another jurisdiction

governs the underlying claims." *Katz v. Tactile Group, Inc.*, No. 24-cv-2047 (JGK), 2026 WL 1265934, at *6 (S.D.N.Y. May 7, 2026).

*1. Legal Standard*

An affirmative defense premised on a statute of limitations argument generally must be pled and proved in an answer to a complaint. *Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). Nevertheless, such a defense may be raised in a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, so long as "the defense appears on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (quoting *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998)). Dismissal is appropriate where "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law."[3] *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015) (quoting *Staehr*, 547 F.3d at 425). In that circumstance, the motion remains subject to the more stringent standard applicable to a motion to dismiss. *See McKenna*, 386 F.3d at 436.

And while the "burden of proving that a particular statute of limitation has expired falls on the defendant," the "plaintiff bears the burden of proving that a particular statute of limitation has been tolled." *Soward v. Deutsche Bank AG*, 814 F. Supp. 2d 272, 278 (S.D.N.Y. 2011) (quoting *Cuccolo v. Lipsky, Goodkin & Co.*, 826 F. Supp. 763, n.2 (S.D.N.Y 1993)); *see also Essex Capital Corporation v. Garipalli*, No. 17-cv-6347 (JFK), 2018 WL 6618388, at *2 (S.D.N.Y. Dec. 18, 2018) (noting that a plaintiff whose claims are facially time-barred "has the burden of pleading facts sufficient to establish that the statutes of limitations should be tolled") (quoting *VoiceOne Communications, LLC v. Google Inc.*, No. 12-cv-9433 (PGG), 2014 WL 10936546, at *7 (S.D.N.Y. Mar. 31,

---

[3] This is because "[t]he pleading requirements in the Federal Rules of Civil Procedure . . . do not compel a litigant to anticipate potential affirmative defenses, such as the statute of limitations, and to affirmatively plead facts in avoidance of such defenses." *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007) (citing *Jones v. Bock*, 549 U.S. 199 (2007)).

2014)). Accordingly, "where there is even 'some doubt' as to whether dismissal is warranted, a court should not grant a Rule 12(b)(6) motion on statute of limitations grounds." *PK Music Performance, Inc. v. Timberlake*, No. 16-cv-1215 (VSB), 2018 WL 4759737, at *7 (S.D.N.Y. Sept. 30, 2018) (citation omitted).

*2. Borrowing Statute and Applicable Statute of Limitations*

Because New York law governs this action, so too does New York's borrowing statute, which is part of that law. As the New York Court of Appeals has explained, there is "a 'significant difference' between . . . common-law conflicts principles and a statute of limitations issue governed by the CPLR, including CPLR 202" because "CPLR 202 is in derogation of the long-standing common-law conflicts principle that the law of the forum applies to procedural issues such as the statute of limitations." *2138747 Ontario, Inc. v. Samsung C&T Corp.*, 31 N.Y.3d 372, 379 (2018); *see also Arcadia Biosciences*, 356 F. Supp. 3d at 397. Accordingly, although neither party addresses this point with respect to the contract claims, New York's borrowing statute governs the timeliness analysis here.

New York's borrowing statute provides that "when a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action accrued." *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998) (citing N.Y. C.P.L.R. § 202). This means that "the shortest statute of limitations available" governs. *In re Coudert Bros. LLP*, 673 F.3d 180, 190 (2d Cir. 2012) (emphasis omitted).

Under New York law, claims for breach of contract[4] and breach of the implied covenant of good faith and fair dealing are subject to a statute of limitations of six years from the alleged breach. *See* N.Y. C.P.L.R. § 213(2); *see also Miller v. Metropolitan Life*

[4] Barisone's claim for breach of organizational rules is, in substance, a breach of contract claim, as it arises from alleged violations of obligations imposed on USEF by its Governing Documents, which both parties acknowledge constitute a contract. *See* Doc. 23 at 14; Doc. 30 at 15.

*Insurance Company*, 979 F.3d 118, 121 (2d Cir. 2020).[5] Claims for breach of fiduciary duty are generally subject to a three-year statute of limitations where the relief sought is monetary.[6] *See* N.Y. C.P.L.R. § 214(5); *see also Great American Insurance Company v. Gemstone Property Management LLC*, No. 23-cv-9100 (LJL), 2025 WL 2196886, at *15 (S.D.N.Y. Aug. 1, 2025).[7] Claims for negligence are likewise subject to a three-year statute of limitations. *See* CPLR 214(5); *see also Crew Ventures, LLC v. Phillips*, No. 24-cv-06941 (ER), 2026 WL 685886, at *3 (S.D.N.Y. Mar. 11, 2026). "New York follows 'the traditional definition of accrual—a cause of action accrues at the time and in the place of the injury." *Thea*, 807 F.3d at 498 (quoting *Global Financial Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529 (1999)).

Under New Jersey law, as under New York law, claims for breach of contract and breach of the implied covenant of good faith and fair dealing are subject to a six-year statute of limitations.[8] *See* N.J.S.A. § 2A:14-1; *see also Richer Marketing Inc. v. Fairfield Gourmet Foods Corp.*, No. 15-cv-6793 (CCC), 2017 WL 3641742, at *2 (D.N.J. Aug. 24, 2017). Claims for breach of fiduciary duty are similarly subject to a statute of limitations of six years. *See* N.J.S.A. § 2A:14-1; *see also Jeffrey Rapaport M.D., P.A. v.*

---

[5] For contractual claims, "the claim accrues when the breach occurs, not upon discovery of it." *DM Manager LLC v. Fidelity National Information Services, Inc.*, No. 23-cv-00617 (ER), 2024 WL 1347724, at *15 (S.D.N.Y. Mar. 29, 2024), *aff'd*, No. 24-1217, 2025 WL 863338 (2d Cir. Mar. 19, 2025).

[6] Under New York law, the statute of limitations applicable to a breach of fiduciary duty claim depends on the substantive nature of the relief sought. *See Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, n.3 (2d Cir. 2013) (citing *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139 (2009)). In actions "[w]here the remedy sought is purely monetary in nature, there is generally a three-year limitations period." *Monterey Bay Military Housing, LLC v. Ambac Assurance Corporation*, 19-cv-9193 (PGG), 2026 WL 891704, at *38 (S.D.N.Y. Mar. 31, 2026) (internal quotations and citation omitted). However, where the nature of relief sought is equitable, the applicable statute of limitations is six years. *IDT Corp*, 12 N.Y.3d at 139 (citing *Loengard v. Santa Fe Industries, Inc.*, 70 N.Y.2d 262, 266–67 (1987)).

[7] A claim for breach of fiduciary duty typically accrues "when all the elements of the tort can be truthfully alleged in a complaint." *Great American Insurance*, 2025 WL 2196886, at *15 (internal quotations and citation omitted).

[8] In general, "a breach of contract claim accrues on the date on which the right to institute and maintain a suit first arose." *Unbeatablesale.com, Inc. v. LJM Supplies Corp.*, No. 25-cv-5389 (MAS), 2026 WL 242085, at *3 (D.N.J. Jan. 29, 2026) (internal quotations omitted) (quoting *County of Morris v. Fauver*, 707 A.2d 958, 971 (N.J. 1998)).

*Robin S. Weingast & Associates, Inc.*, 859 F. Supp. 2d 706, 715 (D.N.J. 2012). Claims for negligence are subject to a two-year statute of limitations. *See* N.J.S.A. § 2A:14–2; *see also O'Neill v. CitiMortgage, Inc.*, 12-cv-847 (JHR), 2012 WL 5868956, at *3 (D.N.J. Nov. 19, 2012). In New Jersey, generally, "the statute of limitations for an action begins to run when all the elements of the cause of action are present or, more plainly, 'from the moment of the wrong.'" *Amland Properties Corp. v. Aluminum Company of America*, 808 F. Supp. 1187, 1190 (D.N.J. 1992) (quoting *Lopez v. Swyer*, 62 N.J. 267, 274 (1973)).

Barisone commenced this action on July 31, 2025. *See* Doc. 1. Barisone is a Florida resident, Doc. 21 ¶ 1, and the parties do not dispute that the crux of the alleged injuries underlying the amended complaint occurred at his New Jersey farm.[9] The claims therefore accrued in New Jersey for purposes of C.P.L.R. § 202. *See Stuart*, 158 F.3d at 627 (citing N.Y. C.P.L.R. § 202)). Accordingly, under New York's borrowing statute, the claims are subject to the shorter applicable statute of limitations, including any relevant tolling provisions, under either New York or New Jersey law. *Id.*

In their briefing, however, the parties assume that New York's statute of limitations governs the breach of organizational rules, breach of contract, breach of the implied covenant of good faith and fair dealings, and breach of fiduciary duty claims, without addressing whether New Jersey's limitations periods might apply. The Court therefore applies New York's statute of limitations and tolling provisions to those claims. *See Dumontet v. UBS Financial Services, Inc.*, No. 21-cv-10361 (GHW), 2024 WL 1348752, at n.19 (S.D.N.Y. Mar. 29, 2024) (stating in the context of a motion to dismiss that, "[t]o the extent that there are other statutes of limitations under New York law that might govern [p]laintiff's claims, the parties do not raise them in their briefing" and the court therefore declined to consider them). With respect to the negligence claim, USEF

[9] The amended complaint does not make clear whether any of Barisone's injuries occurred while in Florida. USEF asserts that all of Barisone's injuries occurred in New Jersey. Doc. 23 at 25–26. Barisone does not dispute that assertion. The Court therefore proceeds on the understanding that the relevant injuries accrued in New Jersey for purposes of the borrowing statute analysis.

contends that New Jersey's two-year statute of limitations applies, but that even under New York's three-year statute of limitations, Barisone's negligence claim would still be time-barred, Doc. 23 at 25–26, and Barisone does not address New Jersey's tolling provisions in his memorandum.

To the extent that any of Barisone's claims fall outside the applicable statute of limitations, Barisone contends that they are nonetheless timely on two grounds: first, that the limitations period was tolled pursuant to New York's continuing violation doctrine; and second, that he is entitled to tolling under New York's insanity tolling provision C.P.L.R. § 208(a). Doc. 30 at 11–15. The Court addresses each claim in turn.

*i. Continuing Violation Doctrine*[10]

In general, "the statute of limitations accrues when the contract is first breached." *DM Manager LLC v. Fidelity National Information Services, Inc.*, No. 23-cv-00617 (ER), 2024 WL 1347724, at *15 (S.D.N.Y. Mar. 29, 2024), *aff'd*, No. 24-1217, 2025 WL 863338 (2d Cir. Mar. 19, 2025). A "narrow exception" to this rule applies, however, "for claims 'premised on a continuing wrong' when the contract 'imposes a continuing duty that is repeatedly breached.'" *Id.* (quoting *Fioranelli v. CBS Broadcasting Inc.*, 551 F. Supp. 3d 199, 256 (S.D.N.Y. 2021)). Tolling based on the continuing violation doctrine "may only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct." *Miller*, 979 F.3d at 122 (quoting *Salomon v. Town of Wallkill*, 174 A.D.3d 720, 721 (2d Dep't 2019)). Thus, the doctrine is available based on "a series of independent, distinct wrongs," but not where there is merely "a single wrong that has continuing effects." *Mindspirit, LLC v. Evalueserve Ltd.*, 346 F. Supp. 3d 552, 593 (S.D.N.Y. 2018) (quoting *Maloul v. New Colombia Research, Inc.*, No. 15-cv-8710 (KPF), 2017 WL 2992202, at *5 (S.D.N.Y. July 13, 2017)).

---

[10] Courts also refer to the continuing violation doctrine as the continuing wrong doctrine. *See Miller*, 979 F.3d at n.2.

Barisone's claims incorporate allegations of both USEF's failure to act on his own report made against Kanarek in August 2019, and more significantly, USEF's earlier failure to act on the reports submitted by Parkinson, Breuckmann, and Stagaard beginning in 2017 or 2018. *See* Doc. 21 ¶ 143. Barisone's own report was made less than a week before he shot Kanarek, *see id.* ¶¶ 95, 101, and the gravamen of the amended complaint appears to be USEF's failure to investigate and sanction Kanarek when those earlier complaints were first made—a failure which, Barisone contends, allowed Kanarek's conduct to continue unchecked and ultimately caused him to shoot her, s*ee id.* ¶¶ 58, 167, 172.

Barisone argues that his contract claims are predicated on USEF's failure to investigate and report Kanarek following his own August 2019 communications, which "falls within the six-year limitations period." Doc. 30 at 11. He further argues that "[e]ven if some of [USEF's] breaches occurred before the limitations period," those earlier breaches may properly be incorporated into this action as timely through the continuing violations doctrine. *Id.* Specifically, he contends that while USEF's "initial breach of its obligations to protect and safeguard its members arose in 2018 when it ignored the pleas of [Parkinson, Breuckmann, and Stagaard] to investigate the abusive conduct of . . . Kanarek," *id.*, USEF's "continuous failure to properly investigate complaints made about Kanarek constituted an ongoing breach that tolls the statute of limitations," *id.* at 12–13. He contends, therefore, that the statute of limitations began to run anew in August 2019, when USEF again failed to investigate and report Kanarek following Barisone's report. *See id.* at 11. And because this action was filed within six years of that alleged breach, Barisone maintains that his breach of organizational rules and breach of contract, and breach of the implied covenant of good faith and fair dealing claims are timely. *Id.*

While USEF appears to adopt Barisone's theory that its failure to investigate the earlier complaints led to Barisone shooting Kanarek, it argues that the statute of

limitations period began to run at the time of the initial breach, in 2017 or 2018, which is beyond the six-year statute of limitations. Doc. 23 at 15; Doc. 31 at 11. According to USEF, all of Barisone's damages are traceable to that initial failure, such that any subsequent failure amounts to merely the continuing effects of the initial breach and does not restart the statute of limitations. Doc. 31 at 11–12. USEF therefore argues that Barisone's invocation of the continuing violation doctrine "is entirely misplaced," and that his arguments to the contrary "deserve[] little attention." *Id.*

Here, the amended complaint alleges a distinct and separate breach against USEF when it, again, failed to investigate and report Kanarek after receiving Barisone's complaint in August 2019. *See* Doc. 21 ¶¶ 142–43. That alleged failure to act constitutes a new breach, giving rise to a new cause of action. *See Guilbert v. Gardner*, 480 F.3d 140, 150 (2d Cir. 2007) (noting that "each successive breach may begin the statute of limitations running anew"). Because this action was filed on July 31, 2025, within six years of Barisone's complaint, the contract claims predicated on Barisone's conduct are timely.

Barisone's invocation of the continuing violations doctrine based upon USEF's alleged failures to investigate the earlier reports is unpersuasive. *See* Doc. 30 at 11–13. Although Barisone contends that USEF "had an ongoing duty to enforce the protections provided . . . by the Governing Documents and by the [Amateur Sports] Act," *id.* at 12, he does not identify any specific contractual provision imposing the sort of continuing, freestanding duty alleged by him. Absent such a continuing obligation, the alleged breaches are properly understood as discrete acts or omissions. Indeed, the continuing wrong doctrine extends the statute of limitations "when the contract imposes a continuing duty on the breaching party." *Henry v. Bank of America*, 147 A.D.3d 599, 601 (1st Dep't 2017). Courts consistently reject attempts to invoke the doctrine where the alleged misconduct consists merely of continuing consequences flowing from an earlier, discrete breach. *See, e.g.*, *Comm Trade USA, Inc. v. INTL FCStone, Inc.*, No. 13-cv-3998 (KBF),

2014 WL 787912, at *9 (S.D.N.Y. Feb. 27, 2014) (noting that "[t]o the extent that plaintiff asserts simply an ongoing breach of the contract—with damages increasing as the breach continued—the continuing wrong theory does not apply"); *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1041 (2d Cir. 1992) (explaining that plaintiffs could not rely on the continuing wrong theory for an "ongoing" violation because "performance under the contract merely affects damages and does not give rise to a new cause of action").

Accordingly, the alleged breaches relating to Parkinson, Breuckmann, and Stagaard are not properly incorporated into this action through the continuing violations doctrine.

*ii. Insanity Tolling*

Both New York and New Jersey provide for a tolling of the statute of limitations based on a variable degree of a mental condition. In New York, C.P.L.R. § 208 provides for tolling of a limitations period "[i]f a person entitled to commence an action is under a disability because of . . . insanity at the time the cause of action accrues." N.Y. C.P.L.R. § 208(a). In New Jersey, N.J.S.T. § 2A:14-21 tolls the limitations period "[i]f a person entitled to commence an action . . . has a mental disability that prevents the person from understanding his legal rights or commencing a legal action at the time the cause of action or right or title accrues." N.J.S.T. § 2A:14-21.

In enacting New York's insanity tolling provision, the Advisory Committee rejected a proposal to substitute "mental illness" for "insanity" for fear that such a change in terminology could lead to unwarranted extensions of the tolling statute. *See McCarthy v. Volkswagen of America, Inc.*, 55 N.Y.2d 543, 548 (1982). In contrast, New Jersey's insanity tolling statute changed the word "insane" to the word "mental disability." *See Giannakopoulos v. Mid State Mall*, 438 N.J.Super. 595, 610 (App. Div. 2014). Accordingly, because New York's tolling provision is more restrictive than its New Jersey

counterpart, and because the parties likewise focus their arguments on New York law, the Court analyzes Barisone's tolling argument under C.P.L.R. § 208.

The insanity toll is "narrowly interpreted." *McCarthy*, 55 N.Y.2d at 548. Accordingly, the New York Court of Appeals has held that "the Legislature meant to extend the toll for insanity to only those individuals who are unable to protect their legal rights because of an over-all inability to function in society." *Id.* A plaintiff seeking to obtain the benefit of the toll must also demonstrate that he was insane at the time the cause of action accrued or that the insanity was caused by the event upon which the suit is predicated, and also that the insanity was continuous during the relevant statutory period. *See de los Santos v. Fingerson*, No. 97-cv-3972 (MBM), 1998 WL 740851, at *3 (S.D.N.Y. Oct. 23, 1998). Where a plaintiff experiences "a lucid interval of significant duration, preceded and followed by a period of insanity, the toll is lost and is not resurrected when a plaintiff relapses into insanity." *Graboi v. Kibel*, 432 F. Supp. 572, 578–79 (S.D.N.Y. 1977). The plaintiff bears the burden of establishing that the limitation period should be tolled. *See Dumas v. Agency for Child Development-New York City Head Start*, 569 F. Supp. 831, 833–34 (S.D.N.Y. 1983).

The insanity tolling statute "speaks in terms of insanity, not merely mental illness." *Dumas*, 569 F. Supp. at 833. Accordingly, the statute requires a substantial showing of incapacity, namely a mental condition that is "severe and incapacitating." *Id.*; *see Swartz v. Berkshire Life Insurance Co.*, No. 99-cv-9462 (JGK), 2000 WL 1448627, at *5 (S.D.N.Y. Sept. 28, 2000) (noting that the mental condition must cause the plaintiff to be "totally unable to function" in order to invoke the insanity tolling); *Eisenbach v. Metropolitan Transportation Authority*, 62 N.Y.2d 973, 975 (1984) (noting that insanity under C.P.L.R. § 208 is "a concept equated with unsoundness of mind"). Conditions such as "apathy, depression, posttraumatic neurosis, psychological trauma and repression therefrom or mental illness alone have been held to be insufficient" to invoke the insanity toll. *de los Santos*, 1998 WL 740851, at *4; *see also Swartz*, 2000 WL 1448627, at *5

(stating that "[d]ifficulty in functioning is not sufficient to establish insanity" under C.P.L.R. § 208).

Determining whether a plaintiff is insane for purposes of the insanity tolling requires a pragmatic, fact-specific inquiry into the plaintiff's ability to safeguard his or her legal rights. *See McCarthy*, 55 N.Y.2d at 548. Courts look to the plaintiff's conduct as well as the relevant surrounding facts and circumstances. *See e.g.*, *Dumas*, 569 F. Supp. at n.5; *Graboi*, 432 F. Supp. at 579; *see also Cerami v. City of Rochester School District*, 82 N.Y.2d 809, 812 (1993).

USEF contends that Barisone's argument that the statute of limitations was tolled due to insanity is both "ironic and misplaced." Doc. 31 at 12. Specifically, it argues that during the period in which he claims insanity, Barisone was actively litigating claims connected to the shooting thereby "demonstrat[ing] his capacity and willingness to assert causes of actions on his own behalf." Doc. 23 at 26.

Although such conduct is relevant to the CPLR 208 inquiry,[11] the Court cannot conclude, at this stage, that Barisone is foreclosed from invoking New York's insanity tolling statute.

Most significantly, in April 2022, Barisone was found not guilty by reason of insanity in connection with his August 2019 shooting of Kanarek. Doc. 21 ¶ 120. Thereafter he was transferred to the Anne Klein Forensic Center and then to the

---

[11] For example, in *Vallen v. Carrol*, the court granted summary judgment in favor of the defendant, holding that the plaintiff was not entitled to the insanity tolling. *Vallen v. Carrol*, 02-cv-5666 (PKC), 2005 WL 2296620, at *5 (S.D.N.Y. Sept. 20, 2005). In reaching that conclusion, the court relied on evidence demonstrating that, during the period for which the plaintiff sought tolling based on alleged insanity, the plaintiff, "proceeding *pro se*, filed five separate lawsuits in two different fora in an effort to enforce and protect his legal rights" and that "[i]n two of the pleadings, [the plaintiff] affirmatively expressed an understanding of the applicable statute of limitations." *Id.* at *4. The court further emphasized that the plaintiff "had a full opportunity to conduct discovery," but had nevertheless "been unable to raise a triable issue of fact as to his ability to protect his legal rights during the period for which he claims tolling." *Id.* at *5.

Here, Barisone has not yet been afforded the opportunity to conduct discovery. Moreover, unlike the plaintiff in *Vallen*, Barisone did not file any of the legal actions *pro se*. *See* Doc. 26. Rather, all of the legal actions, including answering a complaint with counterclaims and initiating several lawsuits, were done through an attorney. *See id.*

Greystone Park Psychiatric Hospital. *Id.* ¶¶ 123–24. During this period of involuntary institutionalization at psychiatric hospitals, Barisone contends that the trial judge in the criminal case held periodic hearings at which psychiatrists and other mental health professionals testified regarding his mental condition, including whether his mental condition was such that he could return to society. Doc. 21 ¶ 124; Doc. 30 at 14. It was not until November 2023 that a determination was made that Barisone was no longer "dangerous to self, others, or property as a result of mental illness as to require institutionalization." Doc. 30 at 14; *see also* Doc. 21 ¶ 124.

To be sure, a finding of not guilty by reason of insanity in a criminal proceeding does not, standing alone, necessarily establish per se insanity for C.P.L.R. § 208 purposes. *C.f. Graboi*, 432 F. Supp. at 579 (noting that the determination whether one is considered insane under C.P.L.R. § 208 "[c]learly . . . does not rest solely upon whether a person is an adjudicated incompetent"). Nor does involuntary psychiatric institutionalization. *See Shutsha v. Cao*, No. 21-cv-2461 (CM), 2021 WL 1910659, at *3 (S.D.N.Y. May 10, 2021) (noting that "[u]nder New York law, psychiatric hospital patients are not entitled to per se tolling of the statute of limitations due to insanity").

However, the Court cannot conclude, on the present record, that Barisone is foreclosed from invoking New York's insanity tolling statute C.P.L.R. § 208. The amended complaint plausibly alleges facts bearing on his mental incapacity and ability to protect his legal rights during the limitations period. Given the inherently fact-intensive nature of this inquiry, dismissal of Barisone's claims as time-barred is therefore premature.

**D. Merits of the Claims**

*1. Breach of the Governing Documents and Breach of Contract*

Both the breach of the Governing Documents and breach of contract claim concern alleged violations of duties imposed upon USEF by its Governing Documents.[12] *See* Doc. 21 ¶¶ 128, 173–74. The parties concede that the Governing Documents created a contractual relationship, a violation of which may sound in breach of contract. Doc. 23 at 14; Doc. 30 at 11. The Court therefore analyzes these claims together. *C.f. Ruiz v. Sauerland Event GmbH*, 801 F. Supp. 2d 118, 124 (S.D.N.Y. 2010) (stating that "[t]he rules and regulations of a private organization are construed by the New York courts as providing contractual rights and may serve as the basis of a breach of contract claim").

A breach of contract claim in New York requires "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). In pleading these elements, "a plaintiff must identify what provisions of the contract were breached as a result of the acts at issue." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 189 (S.D.N.Y. 2011) (internal citation omitted).

*a. Governing Documents*[13]

Barisone alleges that USEF breached its Governing Documents by "fail[ing] to take appropriate, timely, or required action." Doc. 21 ¶ 143. Specifically, he contends

---

[12] Barisone does not dispute this characterization. To the contrary, in his opposition, he addresses both USEF's alleged failure to investigate Kanarek's conduct pursuant to its Governing Documents and its alleged failure to report that conduct to the Center for SafeSport under the single heading "Breach of Contract." *See* Doc. 30 at 15–19.

[13] USEF represents that although multiple versions of the Governing Documents may be implicated by the allegations in the amended complaint, the 2019 versions accurately reflect USEF's obligations under any applicable version. Doc. 25 ¶¶ 2, 6, 7. Barisone does not comment on this and appears to analyze his claims under the 2019 version as well. *See* Doc. 30 at 18, 22. Indeed, Barisone asserts that his breach of contract action arose in August 2019. *See id.* at 11. The Court therefore applies the 2019 version throughout its analysis.

that USEF breached its General Rules, its Bylaws, its Code of Conduct, and its Safe Sport Policy. *Id.* ¶¶ 128, 173–74. Each is addressed in turn.

*i. USEF General Rules*

Barisone alleges that USEF breached Chapters 6[14] and 7[15] of the General Rules by failing to investigate and, if warranted, take disciplinary action against Kanarek. Doc. 21 ¶¶ 137, 140, 149. USEF responds that the Rules apply exclusively to USEF competitions and are therefore not applicable to Kanarek's alleged conduct. Doc. 23 at 15–16.

The Rules, by their own terms, are applicable only to competitions.[16] General Rule 151 states that "[a]ny question not covered by the rules of [USEF] shall be decided by the Directors of the competition at which it arises," and further states that "[a]ll

---

[14] As relevant here, Chapter 6 titled "PROTESTS, CHARGES, ATHLETE GRIEVENCES, HEARING, ADMINISTRATIVE PENALTIES AND PLEA AGREEMENTS" governs the procedures for filing and adjudication protests, charges and grievances; it specifies who may file such matters, the required contents of each filing, and the procedures governing hearings, including the authorization to temporary suspensions in appropriate circumstances pending a hearing. *See* Doc. 25-2 at 64–75.

[15] As relevant here, Chapter 7 titled "VIOLATIONS AND PENALTIES" identifies conduct that constitutes a violation of the USEF Rules and the disciplinary measures that may be imposed on individuals in connection with licensed competitions. *See* Doc. 25-2 at 77–80.

[16] By and large, the General Rules are directed towards competition-specific conduct only. Chapter 6, however, contains numerous provisions which are somewhat ambiguous—such as 601.4, 601.5, 602.8, 611.1, and 611.2. *See* Doc. 25-2 at 64, 65, 69–70. A prime example is General Rule 602.8, which provides that "[a]ny member of [USEF] may file a protest or charge or grievance with the [h]earing [c]ommittee pertaining to any matter within the cognizance of [USEF] and alleging violations of any provision of [USEF's] Bylaws or Rules, the Amateur Sports Act of 1978, or the [United States Olympic Committee's] Constitution or By-Laws." *Id.* at 65. This provision can be read to permit the filing of protests, charges, and grievances for matters beyond the competition context and outside of the General Rules, but also for violations of the Bylaws, the Amateur Sports Act, and the United States Olympic Committee's Constitution and By-Laws. However, the definitions of protest, charge, and grievance as used throughout Chapter 6, and the General Rules as a whole, support the conclusion that Chapter 6 is directed only towards competition-related disputes. *See id.* at 65–66 (defining a "protest" as a complaint that may be filed by certain participants and USEF members "present at the competition" with the show committee or competition management of a licensed competition or USEF hearing committee alleging a violation of any USEF rules); *id.* at 66 (defining a "charge" as a complaint arising in connection with USEF licensed competitions, filed by certain USEF officials or competition officials with the show committee, competition management, or the USEF hearing committee alleging a violation of any USEF rules); *id.* (defining a "grievance" as a complaint filed by an athlete, coach, trainer, or other specified individuals, "regarding his/her opportunity to participate in, or to attempt to qualify for selection to participate in" certain equestrian competitions).

In any event, the amended complaint does not allege that any complaint was brought before the hearing committee pursuant to General Rule 602.8; and to the extent Barisone's claims implicate alleged violations of the Bylaws, those are addressed separately. Moreover, even if Barisone's complaints were properly brought under the General Rules, his claims would still fail for the independent reason that he cannot establish damages proximately caused by USEF's alleged breach, as discussed below.

competitions are governed by the rules in effect on the first day of the competition." Doc. 25-2 at 12, 13. General Rule 701 similarly provides that "[t]he provisions of this rule apply in connection with any [l]icensed [c]ompetition." *Id.* at 77. Nothing in the amended complaint alleges that any of the purported reports against Kanarek were timely filed in connection with events occurring at an equestrian competition.[17]

Moreover, Barisone contends that General Rule 605 "require[s] [USEF] to promptly investigate and, where warranted, take disciplinary action against members engaging in conduct detrimental to the integrity or welfare of" equestrian sport. Doc. 21 ¶ 13. His reliance on General Rule 605 is misplaced. That provision provides that "[a] grievance may be filed by any amateur athlete, or other eligible athlete, coach, [or] trainer . . . *regarding his/her opportunity* to participate in, or to attempt to qualify for selection to participate in" certain equestrian competitions. Doc. 25-2 at 66 (emphasis added). Nothing in the amended complaint plausibly alleges that Barisone, or the other complainants, filed grievances concerning their own opportunity to participate in a competition.[18]

Barisone's reliance on General Rule 609 fares no better. *See id.* ¶ 151. That provision states that, "[i]n connection with any protest, charge, or any other matter which may properly fall within the jurisdiction of the [h]earing [c]ommittee, and upon a finding that considerations involving the health, safety, or welfare of [USEF] members . . . warrant prompt action," the chief executive officer or his designee "*may* . . . temporarily

---

[17] Chapter 6 of the General Rules requires: that protests made directly to the hearing committee be filed "by the tenth business day following the date on which the alleged violation occurred" or, if the alleged violation occurred at a licensed competition "by the tenth business day following the last recognized day of the competition;" that charges made to a show committee or competition management be made "within 48 hours of the alleged violation," and that those made directly to the hearing committee be received by USEF "within a reasonable time;" and that grievances be made "as soon as practicable following the events which are the subject of the grievance. *See* Doc. 25-2 at 65–67.

[18] Although General Rule 605 entitles any person against whom a grievance is made concerning their ability to participate in certain equestrian competitions to a hearing, *see* Doc. 25-2 at 66–67, as explained above, that provision is plainly inapplicable here.

suspend any person from participating in any manner in the affairs of [USEF] or participating in or attending all [l]icensed [c]ompetitions until the [h]earing [c]ommittee can hear the protest, charge or other matter and take such further temporary or other disciplinary action *as it deems appropriate* under the[] Rules." Doc. 25-2 at 68 (emphasis added). By the plain terms of General Rule 609, even if USEF found that prompt action was warranted, any such action would be purely discretionary and would impose no obligation to act.

Barisone's claim that USEF breached its General Rules is therefore dismissed.

*ii. USEF Bylaws*

As to the Bylaws, Barisone alleges that USEF breached its Bylaws by failing to timely administer the reports made against Kanarek in accordance with Bylaw 701.3 and the supplemental procedures promulgated thereunder. Doc. 21 ¶¶ 144–45. USEF responds that no violation occurred because the submissions by Barisone, as well as Parkinson, Breuckmann, and Stagaard, failed to satisfy the formal requirements to make a complaint under the Bylaws. Doc. 23 at 17–18.

Indeed, Bylaw 704 requires that USEF "shall hear any complaint" brought by one member against another.[19] *See* Doc. 25-1 at 35. To trigger that obligation, however, Bylaw 704 mandates that "[a]ny such complaint shall be in writing and signed under oath by the individual" and that it "shall be filed with [USEF's chief executive officer] by hand delivery, certified mail, facsimile, or guaranteed overnight delivery" and that a copy also be "served on the other parties by the same method of delivery at the same time." *Id.*

Barisone does not dispute that his and the other complainants' submissions failed to conform to Bylaw 704's procedural requirements. *See* Doc. 30 at 17. He argues

---

[19] Bylaw 703 is inapplicable here. By its express terms, a grievance maybe filed under that provision "only when the alleged violation affects the opportunity of the complaining athlete . . . coach, [or] trainer . . . to participate in, or to attempt to qualify for selection to participate in" certain equestrian competitions. Doc. 25-1 at 34. As discussed above, none of the reports made by Barisone, or the other complainants, concerned their own opportunity to compete.

instead that USEF never advised him, or the other complainants, of the deficiencies and should therefore be equitably estopped from invoking the procedural requirements of Bylaw 704 as a defense. *Id.*

"[A] claim for equitable estoppel 'rests upon the word or deed of one party upon which another rightfully relies and so relying changes his position to his injury.'" *Gaia House Mezz LLC v. State Street Bank and Trust Co.*, 720 F.3d 84, 90 (2d Cir. 2013) (quoting *Nassau Trust Co. v. Montrose Concrete Products Corp.*, 56 N.Y.2d 175, 184 (1982)). "Equitable estoppel is an 'extraordinary remedy'" which "should be 'invoked sparingly and only under exceptional circumstances.'" *JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 507 F. Supp. 3d 490, 507 (S.D.N.Y. 2020) (internal citations omitted).

To invoke the doctrine, the party asserting equitable estoppel must establish, with respect to the party to be estopped: "(1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts." *In re Vebeliunas*, 332 F.3d 85, 93–94 (2d Cir. 2003) (citing *International Minerals and Resources, S.A. v. Pappas*, 96 F.3d 586, 594 (2d Cir. 1996)). The party asserting estoppel must also show, as to itself: "(1) lack of knowledge and of the means of knowledge of the true facts; (2) reliance upon the conduct of the party to be estopped; and (3) prejudicial changes in their positions." *Id.* at 94 (citing *International Minerals and Resources*, 96 F.3d at 594). Critically, "in the absence of evidence that a party was misled by another's conduct or that the party significantly and justifiably relied on that conduct to its disadvantage, an essential element of estoppel is lacking." *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Management, L.P.*, 7 N.Y.3d 96, 106–07 (2006) (internal quotations omitted).

Barisone's equitable estoppel theory fails on both elements.

First, the amended complaint does not plausibly allege that USEF made any misrepresentation upon which the complainants could reasonably have relied.

Parkinson's initial email to USEF inquired only whether "USEF ha[s] any rules/regulations against members bullying, harassing and cyber stalking other people in the equine industry." Doc. 21-1 at 2. USEF Regulation Department Director Pratt responded by directing her to its Safe Sport policy, which includes its Safe Sport Incident Report Form, and further directed her to the USEF website's Safe Sport page "that provides additional information and resources." Doc. 21-4 at 2. After Parkinson submitted information regarding Kanarek's alleged conduct, as required by the Safe Sport Incident Report Form, Pratt responded that she had sent the details to USEF legal department—and then went silent.[20] Doc. 21 ¶¶ 26–27, 32. Breuckmann was advised by USEF to send Pratt copies of the alleged threatening messages she had been sent by Kanarek, after which she received no response from any USEF's representative. *Id.* ¶¶ 37, 38. Stagaard submitted examples of what she describes as threatening and harassing messages to Gilbert and then to Pratt, and likewise received no reply. *Id.* ¶¶ 42–43, 51–52. Barisone spoke directly with Keating about Kanarek's alleged conduct but contends that she "offered no assistance from the USEF," *id.* ¶ 97, and instead suggested that Barisone "contact the police," *id.*, and that Keating "never offered any help of any kind," *id.* ¶ 98, and further that his attempts to contact Kessler went unanswered, *id.* ¶ 100.

None of these communications contain any representation by USEF that a formal complaint had been filed, was pending, or was being processed. To the contrary, USEF purportedly largely ignored the complainants. There is accordingly nothing in the record upon which Barisone, or the other complainants, could have reasonably relied in believing that a formal complaint had been filed or that Bylaw 704's requirements had been satisfied or waived. Additionally, the amended complaint does not allege that USEF

[20] In fact, Parkinson's emails show that she followed up multiple times with USEF, without a response. In one email Parkinson wrote that she is "just following up on [her] complaint against Lauren Kanarek" and concluded by asking "[i]s U[SEF] going to be able to support [her]?." Doc. 21-7 at 2. After getting no response, Parkinson again emailed Pratt asking "is anything happening with USEF regarding" her report made against Kanarek. Doc. 21-8 at 2. She again received no response. Doc. 21 ¶ 32.

had a duty to inform the complainants of the requirements of Bylaw 704. *See Gaia House Mezz*, 720 F.3d at 90 (explaining that "a party's silence does not give rise to a claim of equitable estoppel when the party has no duty to speak").[21]

Second, the amended complaint contains no allegation that Barisone or any of the other complainants changed their position in reliance on USEF's conduct to their detriment.

Barisone's equitable estoppel argument therefore fails, and his Bylaw claim cannot survive dismissal on that basis.

*iii. USEF Code of Conduct*

Barisone alleges that USEF violated its Code of Conduct, by failing to address and investigate Kanarek's alleged conduct. Doc. 21 ¶¶ 148, 173–74. USEF responds that its Code of Conduct was first adopted in 2021 and therefore could not govern conduct that occurred in or before 2019.[22] Doc. 23 at 18 n.10.

Barisone does not address or dispute USEF's representation that the Code of Conduct was adopted in 2021, or that the conduct underlying this action predates the Code of Conduct by at least a year and a half. *See* Doc. 30 at 19.

The Code of Conduct claim is therefore dismissed.

*iv. USEF Safe Sport Policy*

Barisone contends that USEF breached its Safe Sport Policy by failing to act on the reports made against Kanarek. Doc. 21 ¶ 147. USEF's Safe Sport Policy prohibits participants from engaging in emotional and physical misconduct within any context reasonably related to sport, including emotional misconduct, physical misconduct,

---

[21] Further, Barisone's contention that Bylaw 704's requirement that complaints be written and verified were in violation of the SafeSport Act's mandate that complaints to be made easily, *see* Doc. 30 at 18 (citing 36 U.S.C. § 220541; 36 U.S.C. § 220542), does not help his claim because the SafeSport Act does not contain a private right to sue. *See* 36 U.S.C. § 220505(b)(9).

[22] USEF also contends that even if the Code of Conduct were applicable, Barisone's claim would nonetheless fail because the Code of Conduct "grants USEF broad discretion to investigate alleged violations thereof." Doc. 23 at 18.

bullying, hazing, and harassment. *See* Doc. 25-5 at 8. USEF responds only that its Safe Sport Policy is discretionary and does not require it to punish or suspend those accused of violating the Policy. Doc. 23 at 18–19.

The Safe Sport Policy expressly mandates that "USEF *will* address all alleged non-sexual violations of th[e] Safe Sport Policy." Doc. 25-5 at 11 (emphasis added). The Safe Sport Policy's own flowchart, titled "FEDERATION PROCESS FOR HANDLING REPORTED SAFE SPORT VIOLATIONS," reinforces this obligation. *See id.* at 13. The flowchart states that when a "[n]on-[s]exualized Safe Sport violation [is] reported to [USEF]" it "initiates [an] investigation" then "[r]eview[s] information and materials obtained," after which the "Chief Executive Officer chooses to initiate" either a "No Action Letter," a "Warning Letter," an "Administrative Penalty offer," or "Charges." *Id.* The Safe Sport Policy thus imposes a mandatory duty to investigate, even if the outcome of that investigation remains entirely within USEF's discretion.

Here, the amended complaint sufficiently alleges, and USEF does not dispute, that USEF did not address or investigate the reports made against Kanarek. That failure plausibly constitutes a breach of the Safe Sport Policy's mandatory investigative obligation. As discussed below, however, the claim nonetheless fails on the independent ground that Barisone cannot establish damages proximately caused by USEF's failure to investigate.

*v. USEF's Failure to Report to the Center for SafeSport*

Barisone alleges that USEF breached its Governing Documents by failing to report Kanarek's conduct to the Center for SafeSport. Doc. 21 ¶¶ 173–74. USEF responds that the allegations made against Kanarek did not trigger any reporting obligation. Doc. 23 at 21.

The SafeSport Code grants the Center for SafeSport exclusive jurisdiction to investigate and resolve allegations related to sexual misconduct, and discretionary jurisdiction over non-sexual misconduct including "[e]motional and physical misconduct,

including stalking, bullying behaviors, hazing, and harassment." Doc. 25-6 at 9. Where the Center for SafeSport has only discretionary jurisdiction, the SafeSport Code provides that the national governing body "may investigate and resolve the matter, unless and until such time as the Center [for SafeSport] expressly exercises jurisdiction over the particular allegations." *Id.* USEF's Safe Sport Policy and Bylaws are in accord, each confirming that the Center for SafeSport holds exclusive jurisdiction over sexual misconduct and only discretionary jurisdiction over non-sexual misconduct. *See* Doc 25-1 at 33; Doc. 25-5 at 5. USEF's General Rules similarly limit the mandatory reporting obligation to sexual misconduct, requiring adult USEF members to "report suspected sexual misconduct . . . within 24 hours to the appropriate authorities and to the U.S. Center for SafeSport." Doc. 25-2 at 192.[23]

The mandatory reporting requirement under USEF's General Rules—which requires referral to the Center for SafeSport—applies only to allegations of sexual misconduct. Therefore, no mandatory reporting obligation was triggered. None of the allegations against Kanarek involve sexual misconduct.[24] Because neither USEF's Governing Documents nor the SafeSport Code otherwise imposed a mandatory obligation to report Kanarek's alleged conduct to the Center for SafeSport, this claim is therefore dismissed.

*b. Damages*

Even assuming, *arguendo*, a breach of the Governing Documents, Barisone's claims fail for the independent reason that he cannot establish damages proximately caused by USEF's alleged breach.

Barisone contends it to be an "inescapable fact" that, had USEF initiated an investigation into Kanarek, "the only reasonable conclusion one could reach is that" she

---

[23] The USEF's Code of Conduct, for the reasons discussed above are also inapplicable here.

[24] Because Kanarek's alleged conduct was non-sexual in nature, the Center for SafeSport had only discretionary jurisdiction, and the amended complaint does not allege that the Center for SafeSport chose to exercise it.

would have been temporarily suspended pending an investigation, which "without a doubt" would have led to a more permanent sanction or lifetime ban imposed upon her in 2018 or early 2019, thereby prohibiting USEF member's from engaging in professional equestrian activities with Kanarek. Doc. 21 ¶ 57. As a result, Barisone contends that he would have been obligated to terminate his training relationship with Kanarek and that she would have been required to leave his farm. *Id.* ¶ 58. He further contends that "there is little doubt" that a temporary suspension would have caused Kanarek to cease her alleged conduct and that local police, armed with knowledge of the suspension, would have required her to leave his New Jersey farm. *Id.* ¶ 97. USEF responds that "[t]his quadruple layer of speculation piled upon conjecture premised upon rank supposition" is insufficient to support a finding that the alleged damages were the natural and probable consequences of the alleged breach and nor could they have been contemplated at the time the contract was executed. Doc. 23 at 20.

In order to sustain a breach of contract claim under New York law, the resulting damages must be the direct and proximate cause of the contractual breach. *National Market Share, Inc. v. Sterling National Bank*, 392 F.3d 520, 525 (S.D.N.Y. 2004). "Damages for breach of contract must be 'such only as actually follow or may follow from the breach of the contract.'" *Id.* (quoting *Wakeman v. Wheeler & Wilson Manufacturing Co.*, 101 N.Y. 205, 209 (1886)). "[T]he damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach." *Kenford Co. v. Erie County*, 67 N.Y.2d 257, 261 (1986). Further, a "[p]laintiff cannot recover if it would have suffered the harm regardless of defendant's actions." *Point Productions A.G. v. Sony Music Entertainment, Inc.*, 215 F. Supp. 2d 336, 341–42 (S.D.N.Y. 2002).

Barisone's damages theory fails under that standard. His theory requires the Court to assume, in sequence, that an investigation would have been initiated which would have yielded findings sufficient to warrant a temporary suspension, that USEF had

the authority to and would have elected to impose such a suspension, that in the interim Kanarek would have changed her conduct due to the suspension, that the suspension would have ripened into a permanent ban, that the permanent ban would have compelled Kanarek to accede to vacate his farm or that the local police would have acted upon USEF's determination to suspend Kanarek by evicting her.

Each of these assumptions is independently problematic. Even under the Safe Sport Policy's mandatory investigative obligation, USEF retained broad discretion over the outcome. And even had temporary measures been imposed, it is a matter of pure speculation to assume that Kanarek would have voluntarily vacated the farm, as is whether local law enforcement would have treated a USEF disciplinary action as a basis for intervening.[25]

At each step, the causal chain runs not from USEF's breach to Barisone's injury, but through a series of independent discretionary decisions and third-party actions whose outcomes are entirely uncertain. This series of uncertain outcomes and hypothetical leaps are far too speculative and attenuated to form a basis for contract damages. *See Wiener v. AXA Equitable Life Insurance Company*, 113 F.4th 201, 214 (2d Cir. 2024) (stating that "a defendant who breaches a contract is only liable for direct and proximate damages flowing from the breach"). Barisone's breach of contract claims may therefore be dismissed on this independent ground as well.

*2. Breach of Implied Covenant of Good Faith and Fair Dealing*

Barisone alleges that USEF breached the implied covenant of good faith and fair dealing. Doc. 21 ¶ 178–80. USEF responds that this claim should be dismissed on two independent grounds: first, that the Governing Documents vest USEF with discretionary

---

[25] Barisone argues that it is not speculative to assume that Kanarek would have complied with a "No Contact" order had USEF imposed one. Doc. 30 at 23. In support, Barisone claims that on July 7, 2020, USEF imposed a "No Contact" order on Kanarek, directing her, among other things, not to post derogatory or threatening messages on social media directed at an individual identified as "Claimant 1." *Id.* Barisone further contends that, to date, Kanarek has complied with that order. *Id.*

authority to investigate or suspend members and that the amended complaint fails to plausibly allege that USEF exercised that discretion in an arbitrary, irrational, or bad faith manner; and second, that the claim is entirely duplicative of Barisone's breach of contract claim. Doc. 23 at 24–25.

Under New York law, every contract contains an implied covenant of good faith and fair dealing, "pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Thyroff v. Nationwide Mutual Insurance Co.*, 460 F.3d 400, 407 (2d Cir. 2006) (quoting *M/A-COM Security Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (per curiam)). A claim for breach of the implied covenant "survives a motion to dismiss only if it is based on allegations different from those underlying the breach of contract claim, and the relief sought is not intrinsically tied to the damages that flow from the breach of contract." *JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 128 (2d Cir. 2022). Where "a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013).

That is precisely the case here. Barisone's implied covenant claim rests on the same factual allegations and seeks the same relief as his breach of contract claim—namely, that USEF failed to investigate and take action against Kanarek in accordance with its Governing Documents. And Barisone does not dispute this. Because the two claims are predicated on identical facts and seek identical damages, the breach of implied covenant of good faith and fair dealing is dismissed as duplicative.

*3. Negligence*

Barisone alleges that USEF was negligent in failing to enforce its Governing Documents. Doc. 21 ¶ 182–90. USEF responds that this claim should be dismissed on three independent grounds: first, it owed no legal duty to Barisone; second, the

independent actions of both Barisone and Kanarek constituted superseding causes breaking the causal chain; and third, the negligence claim is duplicative of Barisone's breach of contract claim. Doc. 23 at 26–31.

As a threshold matter, the Court must determine which state's law governs Barisone's negligence claim. Although the alleged harm occurred at Barisone's farm in New Jersey, a formal choice of law analysis is unnecessary on the facts of this case.[26] Such an analysis is required only where "the laws of the competing jurisdictions are actually in conflict," that is, where the applicable law of each jurisdiction provides different substantive rules. *International Business Machines Corp. v. Liberty Mutual Insurance Co.*, 363 F.3d 137, 143 (2d Cir. 2004) (citations omitted). "In the absence of substantive difference, however, a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it." *Id.* Because the elements of negligence are the same under New York and New Jersey laws, no conflict exists. *See Sterlacci v. NBCUniversal Media, LLC*, No. 25-cv-5690 (JPO), 2026 WL 1214449, at *4 (S.D.N.Y. May 4, 2026). The Court therefore applies New York law.

Under New York law, a plaintiff seeking to prove negligence must show: "(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 428 (2d Cir. 2013) (quoting *Akin v. Glens Falls City School District*, 53 N.Y.2d 325, 333 (1981)). "In the absence of a duty, as a matter of law, no liability can ensue." *McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997) (quoting *Gonzalez v. Pius*, 138 A.D.2d 453, 454 (2d Dep't 1988)). That duty must flow from a legal obligation

---

[26] Under New York choice-of-law rules, for claims sounding in negligence, the law of the state where the injury occurred generally governs. *See Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 195 (1985) (explaining that where the negligent conduct occurred in one jurisdiction and the plaintiff's injuries were suffered in another, the locus of the tort "is determined by where the plaintiffs' injuries occurred").

independent of a contract. *Clark-Fitzpatrick, Inc. v. Long Island Rail Road Co.*, 70 N.Y.2d 382, 389 (1987).

At bottom, Barisone's negligence claim is premised on USEF's alleged failure to protect him from the alleged conduct of a third party—Kanarek. As a general rule, New York law does not impose upon persons the duty to protect others from injuries caused by third persons. *See Purdy v. Public Administrator of County of Westchester*, 72 N.Y.2d 1, 8 (1988). And "[t]his is so . . . even where as a practical matter defendant could have exercised such control." *Id.* (internal quotations omitted). Such a duty may be imposed, however, where: (1) "a special relationship exists between the defendant and the third party such that the defendant does have a duty to control the acts of the third party;" or (2) "a special relationship exists between the defendant and the plaintiff, creating an obligation on the part of the defendant to protect the plaintiff from harm inflicted by the third party." *In re September 11 Property Damage and Business Loss Litigation*, 468 F. Supp. 2d 508, 525 (S.D.N.Y. 2006), *aff'd sub nom*, *Aegis Insurance Services, Inc., v. 7 World Trade Co., L.P.*, 737 F.3d 166 (2d Cir. 2013).

The amended complaint does not plausibly allege any facts giving rise to a special relationship between Barisone and USEF. The alleged conduct occurred on Barisone's private farm, in the context of a private business relationship that he entered into freely and was equally free to terminate, entirely without the involvement of USEF. That both Barisone and Kanarek were USEF members does not transform a private dispute into one that USEF had a legal duty to prevent or resolve.

Barisone contends that by adopting and publishing its Governing Documents, promoting them to its membership, and requiring compliance as a condition of participation in USEF-sanctioned activities, USEF voluntarily assumed a duty to exercise reasonable care in carrying out that undertaking. Doc. 21 ¶ 184. The Court is unpersuaded. The Governing Documents define the contractual relationship between USEF and its members; they do not, without more, give rise to an independent legal duty

to protect one member from the conduct of another. To hold otherwise would effectively collapse the distinction between contract and tort. *See Bayerische Landesbank, New York Branch v. Aladdin Capital Management LLC*, 692 F.3d 42, 58 (2d Cir. 2012) (stating that "[u]nder New York law, a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated").

Because Barisone has failed to identify any legal duty owed to him by USEF that exists independently of its Governing Documents, his negligence claim fails at the threshold and is dismissed.

*4. Breach of Fiduciary Duty*

Barisone alleges that USEF breached its fiduciary obligation by failing to protect him from the conduct of Kanarek and Goodwin. Doc. 21 ¶ 192–95. Specifically, he contends that a fiduciary relationship existed because he "placed his trust and confidence in . . . USEF" to exercise a duty of care with respect to the welfare of himself and other USEF members, *id.* ¶ 193, and that he "believe[d] that the expertise and authority of . . . USEF was such that it would exercise its duty of care and protect [him] from the harm that [he] was subjected to by the actions of Kanarek and Goodwin," *id.* ¶ 194. USEF responds that that this claim should be dismissed on three independent grounds: first, that as a non-profit corporation, it owes no fiduciary duties to its members; second, any purported fiduciary duty cannot flow from violations of contractual obligations; and third, no special relationship existed between USEF and Barisone giving rise to a fiduciary duty. Doc. 23 at 31–32.

Under New York law, the elements of a claim for breach of fiduciary duty are: (1) "the existence of a fiduciary duty;" (2) "a knowing breach of that duty; and" (3) damages resulting therefrom." *Johnson v. Nextel Communications, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011). Being a party to a contract, without more, does not give rise to a fiduciary duty. *Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, No. 03-cv-1537 (MBM), 2003 WL 23018888, at *15 (S.D.N.Y. Dec. 22, 2003), *aff'd*, 110 F. App'x 191 (2d Cir.

2004). Such an obligation "must arise from 'a position of trust or special confidence . . . that impose[s] obligations beyond the express agreements' between the parties." *Id.* (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (S.D.N.Y. 1996); *see also EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 20 (2005) (stating that where the parties to a contract "do not create their own relationship of higher trust," the court should not construct or presume one exists).

Barisone has failed to plausibly allege the existence of such a duty. As discussed above, no special relationship existed between Barisone and USEF. And the duties Barisone ascribes to USEF flow entirely from its Governing Documents and do not give rise to obligations beyond those expressly undertaken by the contract.

Barisone's contention that a fiduciary duty arose from his personal trust and confidence in USEF is equally unavailing. *See* Doc. 21 ¶¶ 193–94; Doc. 30 at 20. The fact that one party unilaterally places trust in another is insufficient, as a matter of law, to create a fiduciary relationship. *See Abercrombie v. Andrew College*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006) (stating that "the fact that one party trusts the other is insufficient to create a fiduciary relationship").

Because no relationship is plausibly alleged here, Barisone's breach of fiduciary duty claim is dismissed.

## IV. CONCLUSION

For the foregoing reasons, USEF's motion to dismiss is GRANTED. The Clerk of Court is respectfully directed to terminate the motion, Doc. 22, and to close the case.

It is SO ORDERED.

Dated: August 17, 2026
New York, New York

EDGARDO RAMOS, U.S.D.J.